[L.A. No. 29834. In Bank. May 19, 1971.]

CHARLES BALLARD et al., Petitioners, v.
GAIL V. ANDERSON, as Chairman, etc., Respondent.

## COUNSEL

Alan F. Charles, Paul McKaskle and Terry J. Hatter for Petitioners.

Pelavin & Jensen, Alvin H. Pelavin, Philip K. Jensen, Robert C. Selvidge, Greenbaum, Wolff & Ernest, Harriet F. Pilpel, Nancy F. Wechsler and Ruth Janes Zuckerman as Amici Curiae on behalf of Petitioners.

John D. Maharg, County Counsel, Norman J. Gilbert, Assistant County Counsel, and Paul G. Seehusen, Deputy County Counsel, for Respondent.

## OPINION

**MOSK, J.**—This is an original petition for a writ of mandate to compel the Therapeutic Abortion Committee of Los Angeles County-USC Medical Center to consider on its merits petitioner Carlos' application for a therapeutic abortion without the consent of her parents. We construe for the first time Civil Code section 34.5[1] to determine whether it emancipates minors for the purpose of obtaining therapeutic abortions without parental consent.

The facts are not in dispute. Petitioner Charles Ballard is a licensed physician specializing in obstetrics and gynecology. Petitioner Ana Maria Carlos, appearing by guardian ad litem, is a 20-year-old, unmarried, in-

---

[1]Civil Code section 34.5 provides: "Notwithstanding any other provision of the law, an unmarried, pregnant minor may give consent to the furnishing of hospital, medical and surgical care related to her pregnancy, and such consent shall not be subject to disaffirmance because of minority. The consent of the parent or parents of an unmarried, pregnant minor shall not be necessary in order to authorize hospital, medical and surgical care related to her pregnancy."

digent minor who lives with her one infant child and her mother in Los Angeles County.

On August 14, 1970, petitioner Carlos requested a therapeutic abortion at the Los Angeles County-USC Medical Center. She was referred to Dr. Ballard, who, after a thorough examination, concluded that she was qualified for the surgery according to law. (Health & Saf. Code, §§ 25950-25954.) The Therapeutic Abortion Committee of the Medical Center refused to consider the merits of the Carlos application for the sole reason that Miss Carlos, an unmarried minor living at home, had not obtained parental consent for the abortion.

Petitioners initiated mandamus proceedings before the Court of Appeal on September 14, 1970, at which time Miss Carlos was approximately 10 weeks pregnant. They contended that Civil Code section 34.5 permits minors, otherwise qualified, to receive legal therapeutic abortions without the consent of their parents. An order to show cause was issued on September 28, but the order was discharged and the petition for writ of mandate denied on October 21, 1970. We granted a hearing.

Due to the normal passage of time required for petitioning this court, preparation of briefs, presentation of oral argument and completion of the opinions herein, the petitioner Carlos is no longer eligible for assistance under the Therapeutic Abortion Act because the 20-week period of eligibility provided in the act has expired. (Health & Saf. Code, § 25953.) Nature proved to be more fleet than the judicial process. Therefore, we face a threshold question of mootness.

Well established principles regarding the exercise of judicial jurisdiction persuade us that the instant action should not be dismissed because of mootness. ■ As we stated in our recent unanimous decision, *In re William M.* (1970) 3 Cal.3d 16, 23 [89 Cal.Rptr. 33, 473 P.2d 737]: "[I]f a pending case poses an issue of broad public interest that is likely to recur, the court may exercise an inherent discretion to resolve that issue even though an event occurring during its pendency would normally render the matter moot. 'Such questions [of general public concern] do not become moot by reason of the fact that the ensuing judgment may no longer be binding upon a party to the action.' (*County of Madera* v. *Gendron* (1963) 59 Cal.2d 798, 804 [31 Cal.Rptr. 302, 382 P.2d 342, 6 A.L.R.3d 555].)" (Fn. omitted.) And, in an earlier case, a Court of Appeal applied identical principles with specific reference to a writ of mandate: "As a general proposition courts will not issue a writ of mandate to enforce an abstract right of no practical benefit to petitioner, or where to issue the writ would be useless, unenforceable or unavailing. [Citation.]

However, where the problem presented and the principle involved are of great public interest, the courts have deemed it appropriate to entertain the proceedings rather than to dismiss the same as being moot." (*Kirstowsky* v. *Superior Court* (1956) 143 Cal.App.2d 745, 749 [300 P.2d 163]; see also *Moore* v. *Ogilvie* (1969) 394 U.S. 814, 816 [23 L.Ed.2d 1, 4, 89 S.Ct. 1493]; *Collier* v. *Lindley* (1928) 203 Cal. 641, 645 [266 P. 526].)

 There can be no question that interpretation of Civil Code section 34.5 with regard to the necessity of parental consent for therapeutic abortions is a matter of great public concern. The section has never been construed, and literally thousands of young women comparable to this 20-year-old petitioner will be affected by our decision.[2]

To eliminate any lingering doubt that the instant case involves a recurring problem, Dr. Ballard appended a declaration to the petition stating that the application for therapeutic abortion of another of his patients, Miss Judy Defufco, was rejected by the Therapeutic Abortion Committee on January 22, 1971, solely for lack of parental consent; Miss Defufco, who was 12 weeks pregnant on January 22, 1971, was also under 21 years of age, indigent, and living at home with her parents.[3]

Moreover, Dr. Ballard is a petitioner in this proceeding, and it is clear that the case is not moot as to him, even though any judgment we render has ceased to have practical implications for Miss Carlos. As a physician, Dr. Ballard has standing to raise the interests of his patients, like Judy Defufco, who seek to have him perform therapeutic abortions without parental consent under Civil Code section 34.5. Dr. Ballard's standing arises from his right to practice medicine consistent with law and his potential liability if he performs an abortion, otherwise justified under the Therapeutic Abortion Act, but without parental consent. (Cf. *Griswold*

---

[2] Dr. Ballard of Los Angeles County-USC Medical Center and Dr. John Marshall of Harbor General Hospital declare that six to eight young women comparable to Miss Carlos are rejected for therapeutic abortions by each of the two hospitals each week for lack of parental consent.

Another index of the widespread potential impact of a construction of section 34.5 is provided by the statistics compiled by the California Department of Public Health. Between November 1967 and September 1969, 31 percent of all abortions were performed on young women under age 20, and in the first six months of 1970, 24,531 abortions were performed. (Dept. of Pub. Health, Bureau of Maternal and Child Health, A Report to the 1970 Legislature Third Annual Report on the Implementation of the California Therapeutic Abortion Act.) Although the report covering 1970 has not yet been published, it is certain that several thousand pregnant, unmarried minors sought abortions in that year.

[3] It is significant that respondent did not urge the issue of mootness. Apparently respondent agrees with petitioners that the question of the meaning of section 34.5 is one which should be resolved.

v. *Connecticut* (1965) 381 U.S. 479, 481 [14 L.Ed.2d 510, 512, 85 S.Ct. 1678]; *Barrows* v. *Jackson* (1953) 346 U.S. 249, 257 [97 L.Ed. 1586, 1595, 73 S.Ct. 1031]; *People* v. *Belous* (1969) 71 Cal.2d 954, 963 fn. 5 [80 Cal.Rptr. 354, 458 P.2d 194].)

For the foregoing reasons we conclude the proceeding has not become moot.

Turning to the merits, we must determine whether the Therapeutic Abortion Committee of the Los Angeles County-USC Medical Center properly declined to consider petitioner Carlos' application for therapeutic abortion on the sole ground that she had not obtained parental consent. We conclude that a reasonable construction of Civil Code section 34.5, taking into account its language, legislative history and context, and contemporaneous construction, indicates that minors may obtain therapeutic abortions under law without the necessity of parental consent.

 As a general proposition, parental consent is required for the provision of services to minors for the simple reason that minors may disaffirm their own contracts to acquire such services. (See *Doyle* v. *Giuliucci* (1965) 62 Cal.2d 606, 610 [43 Cal.Rptr. 697, 401 P.2d 1].) Civil Code section 34 provides that a minor may enter into contracts "in the same manner as an adult, subject only to his power of disaffirmance. . . ." Section 35 delineates the scope of the minor's power of disaffirmance and sections 36 and 37 specify certain general exceptions to that power.[4] The policy underlying the rule permitting minors to disaffirm contractual obligations is described in our opinion in *Burnand* v. *Irigoyen* (1947) 30 Cal.2d 861, 866 [186 P.2d 417]: "One deals with infants at his peril. [Citation.] The right of the infant to avoid his contracts is one conferred by law for his protection against his own improvidence and the designs of others. The policy of the law is to discourage adults from contracting with an infant and they cannot complain if as a consequence of violating the rule they are injured by the exercise of the right of dis-

---

[4]Section 35 provides in part as follows: "In all cases other than those specified in sections thirty-six and thirty-seven, the contract of a minor, if made whilst he is under the age of eighteen, may be disaffirmed by the minor himself, either before his majority or within a reasonable time afterwards; . . . and if the contract be made by the minor whilst he is over the age of eighteen, it may be disaffirmed in like manner upon restoring the consideration to the party from whom it was received, or paying its equivalent."

Section 36 provides that "[a] contract, otherwise valid, entered into during minority, cannot be disaffirmed upon that ground either during the actual minority of the person entering into such contract, or at any time thereafter, in the following cases. . . ." The section then lists contracts for necessaries and contracts for dramatic or athletic services which are approved by the superior court.

Section 37 states as follows: "A minor cannot disaffirm an obligation, otherwise valid, entered into by him under the express authority or direction of a statute."

affirmance vested in the infant." (See also *Doyle* v. *Giuliucci* (1965) *supra,* 62 Cal.2d 606, 609; *Sparks* v. *Sparks* (1950) 101 Cal.App.2d 129, 137 [225 P.2d 238].)

Civil Code section 34.5, enacted in 1953, provides an express limitation on the power of minors to disaffirm their contracts for medical services. An unmarried pregnant minor "may give consent to the furnishing of hospital, medical and surgical care related to her pregnancy, and such consent shall not be subject to disaffirmance because of minority. The consent of the parent or parents of an unmarried, pregnant minor shall not be necessary in order to authorize hospital, medical and surgical care related to her pregnancy." The question before us is whether a therapeutic abortion authorized under the Therapeutic Abortion Act is "surgical care related to her pregnancy."

A legal therapeutic abortion under the act may be given only if qualified medical opinion finds (1) a substantial risk that continuance of the pregnancy will impair the mental or physical health of the prospective mother, or (2) that the pregnancy resulted from rape or incest. It is obvious that legal abortion is a surgical procedure, and the Therapeutic Abortion Act establishes that a legal abortion is "care" of the prospective mother "related to her pregnancy." In California, law and medicine recognize that therapeutic abortion is a legitimate medical treatment which may be necessary for the preservation of a pregnant woman's life and health. Had the Legislature intended to exclude legal abortion from the class of surgical care to which the section refers, it would have limited its terminology to "maternity care" or to "prenatal, delivery, and postpartum care."

Respondent contends that the references to "surgical care" in section 34.5 could not encompass legal abortion because the passage of the section in 1953 preceded by 14 years the passage of the Therapeutic Abortion Act. Respondent concedes, as he must, that legal abortions were permitted in California at the time section 34.5 was enacted, but he suggests that consent, whether by the patient or her parents, was not then a relevant consideration since abortions were permitted only in emergency situations when necessary to preserve the life of the mother.

The assertion is specious. In 1953, as under the Therapeutic Abortion Act, legal abortion was "surgical care related to pregnancy"; the only difference was that abortion was permitted then under more limited circumstances.[5] Respondent's suggestion that consent was not relevant to abortion

---

[5]Former Penal Code section 274 provided as follows: "Every person who provides, supplies, or administers to any woman, or procures any woman to take any medicine, drug, or substance, or uses or employs any instrument or other means whatever, with

presumes that abortion was permitted only in cases of such extreme emergency that neither the approval of the parents or of the patient herself was required. But that simply was not the fact. As explained by the Court of Appeal in *People* v. *Ballard* (1959) 167 Cal.App.2d 803, 814 [335 P.2d 204]: "Surely, the abortion statute (Pen. Code, § 274) does not mean by the words 'unless the same is necessary to preserve her life' that the peril to life be imminent. It ought to be enough that the dangerous condition 'be potentially present, even though its full development might be delayed to a greater or less extent. Nor was it essential that the doctor should believe that the death of the patient would be otherwise *certain* in order to justify him in affording present relief.' "[6]

■ In enacting section 34.5 as a limitation upon a minor's power to disaffirm contracts, the Legislature apparently determined that the public interest in encouraging pregnant minors to seek and doctors to provide medical care related to pregnancy outweighed the public policy designed to protect minors from their own improvidence.[7] Although no definitive history is available to explain the legislative purpose, it seems evident the Legislature recognized that an unmarried pregnant minor understandably might be reluctant to seek parental consent for medical care related to her pregnancy and that the parents of such a minor might refuse consent for reasons unrelated to the health of the minor. Certainly, therapeutic abortion, as permitted to save the life of the pregnant woman under pre-1967 law and as authorized under current law, falls within the thrust of such a legislative policy.

A policy which would exclude therapeutic abortion from the class of pregnancy-related surgical care available to minors without parental consent would necessarily be based on some compelling interest of the parents or the state in preventing therapeutic abortions. However, as we have explained,

---

intent thereby to procure the miscarriage of such woman, unless the same is necessary to preserve her life, is punishable by imprisonment in the state prison not less than two nor more than five years."

[6]It is significant also that studies conducted in the 1950s indicated that California hospitals maintained committees to review abortion requests and often permitted abortions which did not fully meet the legal standards. This could not have been unknown to the Legislature. (See Packer and Gampell, *Therapeutic Abortion: A Problem in Law and Medicine* (1959) 11 Stan.L.Rev. 417; Sands, *The Therapeutic Abortion Act: An Answer to the Opposition* (1966) 13 U.C.L.A. L.Rev. 285, 286, 292.)

[7]In *Burnand* v. *Irigoyen* (1947) *supra*, 30 Cal.2d 861, 867-868, we explained the policy underlying the exception for minors' contracts for necessaries (Civ. Code, § 36, subd. 1), as follows: "The policy of the law of this state to protect minors against their own improvidence does not extend to depriving others of the reasonable value of necessaries furnished minors having capacity to contract for them, *since the law recognizes that minors must have their needs provided for.*" (Italics added.)

at the time section 34.5 was enacted therapeutic abortion was authorized only in cases in which the continuation of the pregnancy potentially threatened the life of the pregnant woman. Therefore, any such interest of the parents or the state, to the extent that it prevented a medically authorized therapeutic abortion, would be dangerous to the life of the pregnant minor and incompatible with the policy of the abortion law. We may not assume an irrational legislative purpose to deny to minors life-saving therapeutic abortions for lack of parental consent while permitting all other pregnancy-related surgical and medical care without the necessity of such consent. As we stated in *People* v. *Belous* (1969) *supra*, 71 Cal.2d 954, at page 969: "[T]he law has always recognized that the pregnant woman's right to life takes precedence over any interest the state may have in the unborn."

Respondent suggests that the absence of provision for parental consent in the Therapeutic Abortion Act is evidence of a legislative understanding in 1967 that parental consent was a prerequisite to therapeutic abortion. The implication is that a parental consent provision was deliberately omitted because the legislative sponsors believed that Civil Code section 34.5 required such consent. In support thereof respondent relies on language in a recent law review commentary: "Parental consent in the case of a minor . . . was . . . deemed unnecessary [as a requirement in the Therapeutic Abortion Act] since 'no hospital will perform surgery on such persons in California without such consent, and the bill requires all legal abortions to be done in hospitals.' " (Note (1967) 19 Hastings L.J. 242, 254.) The author of the Note was quoting from a letter received on July 17, 1967, from the office of Senator Anthony C. Beilenson, the co-author of the Therapeutic Abortion Act.

Any authoritative impact of the quotation from a legislative source is dissipated by the sworn declaration of Senator Beilenson executed on November 3, 1970: ". . . I was the principal author of the Therapeutic Abortion Act of 1967; . . . My administrative assistant . . . responded to the inquiries of the Hastings Law Journal by letter, signing my name, in the course of which he made the statement . . . printed at . . . [page] 254 . . . ; I did not write that letter, sign it, nor make that statement; . . . I do not share the above opinion expressed and would in fact have advanced a contrary opinion at the time; . . . The absence of a parental consent provision in the Therapeutic Abortion Act was in contemplation of relying on the existing law, which in the opinion of the Legislative Counsel was that parental consent is not necessary for a minor to obtain a therapeutic abortion." Thus, legislative history surrounding the enactment of the Therapeutic Abortion Act, to the extent that it is persuasive, supports a

view contrary to that espoused by respondent and consistent with petitioners' interpretation of section 34.5.

An additional contention of respondent, drawing upon legislative history, is equally unconvincing. He asserts that a 1970 amendment to section 34.5 although vetoed by the Governor, reflects a legislative judgment that section 34.5 does not encompass therapeutic abortions within its language. Had the amendment become law it would have permitted female minors to consent "to the furnishing of medical care related to the prevention of pregnancy" as well as to the furnishing of hospital, medical and surgical care related to pregnancy. (Senate Bill No. 542.) Respondent urges that because abortion involves the termination of pregnancy, it is no more "related to pregnancy" than medical care for the "prevention of pregnancy"; and the Legislature recognized that medical care for the prevention of pregnancy was not encompassed within the original language of section 34.5.

Mere recitation of the argument demonstrates its fallacy. Medical care aimed at preventing pregnancy is obviously not "related to her pregnancy," an existing condition, because such care is administered before any pregnancy exists and for the purpose of avoiding the condition of pregnancy. Therapeutic abortion, on the other hand, is a surgical procedure to terminate an existing pregnancy which threatens the health of the pregnant woman and, as such, is unquestionably surgical care related to her pregnancy. Indeed, except for a Caesarean section, there is no other surgery common to pregnancy; and a Caesarean, like an abortion, results in terminating pregnancy.

If we examine other medical emancipation sections in the Civil Code, we find that section 34.5 was the first of a consistent series of enactments designed to free particular classes of minors from the necessity of obtaining parental consent to various medical services. In each section the Legislature recognized the interest of the minors in availing themselves of various medical services without parental consent and the interest of the community in permitting the ready availability of medical aid. Thus, section 25.6 enacted in 1961 permits married minors to consent to the furnishing of all hospital, medical and surgical care; section 25.7 (1961) permits minors on active duty in the armed services to consent to all hospital, medical and surgical care; section 34.6 (1968) authorizes minors 15 years of age or older, who are living away from home, to consent to all forms of hospital, medical, surgical, and dental care; and section 34.7 (1968) permits minors 12 years of age or older, who have come into contact with infectious diseases, to consent to medical care related to the treatment of such diseases.

Sections 25.6 and 34.6, by their all-inclusive language, clearly permit certain minors to consent to therapeutic abortion as well as all other types

of medical care. Respondent apparently concedes as much, but fails to explain why therapeutic abortion must be excluded from the classes of surgical care available to pregnant minors without parental consent under section 34.5. Certainly, the incidence of overlapping coverage among the various medical emancipation statutes in no way implies that therapeutic abortions are not encompassed within the language of section 34.5. Sections 25.6 and 34.6 enable married minors and minors over 15 years old who are living away from home to obtain, without parental consent, all types of medical, hospital and surgical care. Section 34.5 emancipates a minor of any age, only if she is pregnant and unmarried and only for medical, hospital and surgical care related to her pregnancy. There is no rational basis for discriminatorily singling out therapeutic abortion as the only type of pregnancy-related surgical care which requires parental consent.

We are aware that section 34.5, unlike section 34.6, contains no specific age limitation. The age of fertility provides the practical minimum age requirement under section 34.5. However, there is an additional limitation implicit in each of the medical emancipation statutes: the minor must be of sufficient maturity to give an *informed consent* to any treatment procedure. (See generally Note, *Restructuring Informed Consent: Legal Therapy for the Doctor-Patient Relationship* (1970) 79 Yale L.J. 1533, 1555-1558.) ■ A minor of any age who is unable to convince competent medical authorities that she has the requisite understanding and maturity to give an informed consent for any medical treatment, including a therapeutic abortion, will be denied such treatment without the consent of either a parent or legal guardian.[8]

Finally, we consider the contemporaneous construction of section 34.5 in several county counsel legal opinions which have pondered the question whether minors may obtain therapeutic abortions without parental consent in hospitals in their communities. Notable are the opinions of the Marin County Counsel, the Fresno County Counsel, the Santa Barbara County Counsel, the Sacramento County Counsel and also the California Legislative Counsel and the General Counsel to the Regents of the University of California. Each of the aforementioned legal opinions expresses the considered view that section 34.5 permits an unmarried pregnant minor to

---

[8]Statistics compiled in California and New York indicate that few minors under age 15 seek therapeutic abortions. In California, of 14,717 legal abortions performed between November 1967 and September 1969, only 3 percent of the patients were under 15 years of age, while 28 percent were between 15 and 19. (Dept. of Pub. Health, Bureau of Maternal and Child Health, *supra.*) In New York, of 34,175 legal abortions performed between July 1 and October 31, 1970, only 1 percent of the patients were under age 15, while 22 percent were between 15 and 19. (New York State Dept. of Health, Preliminary Report on Abortions Performed in New York State from July 1-October 31, 1970.)

obtain a therapeutic abortion without the consent of her parents.[9] An identical stance is taken in the only published commentary on the Therapeutic Abortion Act, cited in West's Annotated Health and Safety Code, sections 25950-25954—Leavy and Charles, *California's New Therapeutic Abortion Act: An Analysis and Guide to Medical and Legal Procedure* (1967) 15 U.C.L.A. L.Rev. 1, 10.[10]

On the basis of the foregoing, we conclude that section 34.5, reasonably construed, permits minors to seek therapeutic abortions without parental consent.[11] Finally we must determine whether petitioners are entitled to relief by way of an extraordinary writ.

■ Petitioners seek to compel the Therapeutic Abortion Committee of the Los Angeles County-USC Medical Center to consider on its merits Miss Carlos' application for therapeutic abortion without requiring her to obtain parental consent. Petitioners do not request us to order the committee to authorize an abortion, but they ask only that the committee be compelled to exercise its discretion to approve or disapprove the application for abortion according to the statutory criteria set forth in Health and Safety Code sections 25951-25954.

The petition for writ of mandate thus falls clearly within the principle enunciated in *Hollman* v. *Warren* (1948) 32 Cal.2d 351 [196 P.2d 562]. In that case, the Governor refused to consider the petitioner's application for appointment as a notary solely because he believed his discretion was limited by a then existing section of the Government Code. We issued a writ of mandate to compel the Governor to exercise his discretion and consider

---

[9]The opinion of George H. Murphy, Legislative Counsel of California, dated May 13, 1970, states in part as follows: "There are no cases interpreting [section 34.5]. . . . A therapeutic abortion involves hospital, medical, and surgical care. Since it would terminate the pregnancy, we think that, should the question be presented to the courts, a therapeutic abortion would be held to involve hospital, medical, and surgical care related to the pregnancy of an unmarried minor within the meaning of Section 34.5. Thus, in view of the broad language of Section 34.5, we think that the courts would hold that this provision applies to, and, as a result, removes the necessity of parental consent for, the abortion pursuant to the act of an unmarried pregnant minor. . . ."

[10]The only contrary administrative construction of the section has been that rendered by the legal counsel to the California Hospital Association and the California Medical Association on June 30, 1970. In that opinion concerned with the possibility of civil liability, counsel expressed apprehension that reliance on section 34.5 "might backfire" because "[i]t is possible that a court could hold that it was not intended that the statute be applied to . . . an induced abortion."

[11]The theme of the dissent is established at the very outset, as it indulges in casuistry in speaking of "girls under the age of 21 [having] the awesome power to extinguish human life." Such emotional rhetoric completely omits recognition of the fact that the authority to determine whether a therapeutic abortion is medically advisable rests entirely with licensed medical doctors on the staff of approved hospitals.

the application on its merits because we determined that the statute relied upon by the Governor was invalid: "While ordinarily, mandamus may not be available to compel the exercise by a court or officer of the discretion possessed by them in a particular manner, or to reach a particular result, it does lie to command the exercise of discretion—to compel some action upon the subject involved." (*Id.* at p. 355.)

Let a peremptory writ of mandate issue as prayed.

Wright, C. J., Peters, J., and Tobriner, J., concurred.

**SULLIVAN, J.**—I dissent.

I cannot agree that when it enacted section 34.5 of the Civil Code in 1953 the Legislature intended to confer on girls under the age of 21 the awesome power to extinguish human life.[1] I do not believe that this statute which was passed 14 years before the Therapeutic Abortion Act (Act) can be reasonably interpreted as somehow infusing into the later enactment a provision—conspicuously absent from the Act itself—permitting any girl under 21 to obtain a therapeutic abortion without parental consent. With all due respect to my colleagues of the majority, I cannot find any validity in the mechanistic process of interpretation by which they reason that, because an abortion involves a surgical procedure performed on a pregnant female person, it must necessarily constitute "surgical care related to her pregnancy" to which an "unmarried pregnant minor" may herself give valid consent under the provisions of section 34.5. Such reasoning, despite its semantic gloss, conveniently ignores the ineluctable fact that the obvious legislative purpose of section 34.5 is to preserve the unborn life, not to destroy it.

Consequently, it is inconceivable to me that the Legislature, in light of its presumed awareness of the dramatic and significant difference between the type of care envisaged by section 34.5 and the type of "care" prescribed by the Act, would have chosen to express an intended equivalence by silence. On the contrary, I believe the only reasonable conclusion is that the Legislature, by its failure to include in the Act any specific provision relating to consent by minors, intended that the matter should be governed by established principles of infant consent. In sum, in this vital and sensitive area

---

[1]The majority, obviously troubled by the broad impact of their holding, suggest that this statement is at least inaccurate because it "omits recognition" of the fact that no abortion can be performed without medical approval. The point, which apparently continues to elude them, is that under the present law the moving party or "applicant" in any abortion is the pregnant female, and that unless she or another can give valid consent to the operation the question of medical authorization does not arise.

of such surpassing human importance one would expect the majority to have satisfied themselves as to a clear legislative declaration devoid of all doubt before concluding that the state had invested in a minor child the power to choose between life and death. The jural principle of reasonable doubt should not be alien to the ancient mandate that "the innocent and the just you shall not put to death." (Exodus 23:7.)

The language of the majority opinion reflects a studied effort to ignore the distinction to which I have adverted. Perhaps the most striking example is found in the majority's consideration of the significance of a 1970 amendment to section 34.5 which, if not vetoed by the Governor, would have permitted a minor to consent to the furnishing of medical care relating to the *prevention* of pregnancy. The majority conclude that this attempted amendment did not demonstrate a legislative recognition that the words "related to her pregnancy" apply only to measures directed toward the safe delivery of a healthy baby. No such recognition is manifested, reason the majority, because preventive care occurs before any pregnancy exists and cannot be "related to [an unmarried pregnant minor's] pregnancy"—thus rendering separate legislative treatment necessary. Abortion, on the other hand, is clearly related to an existing pregnancy and therefore, the majority assure us, is "surgical care related to . . . pregnancy" within the meaning of section 34.5. The fact that abortion results in the *termination* of pregnancy is of no moment, we are told. The language used is quite revealing: "Indeed, except for a Caesarean section, there is no other surgery common to pregnancy; *and a Caesarean, like an abortion, results in terminating pregnancy.*" (*Ante,* p. 882; italics added.)

Surely only the most manifest distortion of meaning can allow the conclusion that a pregnancy is "terminated" in the same sense by abortion and Caesarean section. It belabors the obvious to point out that the difference is one of kind rather than of degree: A Caesarean section is undertaken in the normal case in order to preserve the mother *and give birth to a living child,* whereas an abortion is undertaken in order to *kill a living fetus.* Yet it is this profound distinction which the opinion of the majority would obliterate or ignore. Indeed, it is of this profound distinction that the majority at another point in its opinion can state: "There is no rational basis for discriminatorily singling out therapeutic abortion as the only type of pregnancy-related surgical care which requires parental consent." (*Ante,* p. 883.)

Most significantly, the majority attribute to the Legislature their own intransigence by suggesting that, at the time of the Act, the lawmakers perceived between abortion and Caesarean section a difference too inconse-

quential to deserve mention in the Act. I cannot believe that this is so. I think it is abundantly clear that the Legislature painfully perceives the important distinction between abortion and other surgical procedures undertaken in the course of a pregnancy—and that when and if it determines that an unmarried pregnant minor shall be permitted to consent to an abortion without parental concurrence it will say so in the clearest possible language. In the meantime, and in view of the far-reaching significance of the question,[2] I believe that this court should refrain from reading between the lines of pre-Act legislation[3] in order to fashion its own answer.

I would deny the petition for a peremptory writ of mandate and discharge the alternative writ.

McComb, J., and Burke, J., concurred.

---

[2]The majority, faced with the inexorable reach of their holding to all minor girls, hasten to soften its impact by observing that, according to a Department of Public Health report covering the first 23 months during which the Act was in effect, only 3 percent of abortions were performed on girls under 15. However, that report (Report to the 1970 Legislature, Third Annual Report on the Implementation of the California Therapeutic Abortion Act, Bureau of Maternal and Child Health, Department of Public Health, January 1970) does not limit itself to empty percentages; it also shows that the under-15 group, which included girls down to age 11, was comprised of 443 young women. The next group in point of age (15 through 19) constituted 27.7 percent of all abortion cases and numbered 4,072.

Although the report gives no breakdown as to the reasons for the therapeutic abortions performed on girls under 20 (see Health & Saf. Code, § 25951, subd. (c)), its data for all age groups as a whole is significant. Out of a total of 16,065 applications presented to hospital committees during the period covered by the report, 92 percent (or 14,717) were ultimately approved and the operation performed, and 90 percent (or 14,493) were based on the reason that the continuance of the pregnancy would gravely impair the *mental* health of the mother. It is a fair assumption from the report that the same reason of *mental* health was stated in the preponderance of the cases of young girls under 20.

This last statistic to my mind exposes the precariousness inherent in a young girl's consent to be given, as the majority would have it, after a tormented decision on a delicate question of life, without the sustaining counsel of her parents. In this most sensitive area, we should now, as we have consistently in the past, apply those principles which "carry out the general theory of the law to protect infants, not only from others, but *also from themselves.*" (*Pollock* v. *Industrial Acc. Com.* (1936) 5 Cal.2d 205, 210-211 [54 P.2d 695].) (Italics added.)

[3]The majority, adverting to Civil Code section 34.6, which was enacted one year after the Act, also concludes that this section "by [its] all-inclusive language, clearly permit[s] certain minors to consent to therapeutic abortions as well as all other types of medical care." Although the effect of "all-inclusive language" in a post-Act statute may indeed be different from that of such language in a pre-Act statute, the clear inapplicability of section 34.6 to this case renders a present discussion of that matter superfluous.