[No. D009291. Fourth Dist., Div. One. Dec. 20, 1989.]

In re PETRA B., a Person Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY DEPARTMENT OF SOCIAL SERVICES,
Plaintiff and Respondent, v.
ERIC B., Defendant and Appellant.

1164

**COUNSEL**

Susan E. Cardine, under appointment by the Court of Appeal, for Defendant and Appellant.

Edwin L. Miller, Jr., District Attorney, Peter C. Lehman and D. Michael Ebert, Deputy District Attorneys, for Plaintiff and Respondent.

James G. Dunn, under appointment by the Court of Appeal, for Minor.

**OPINION**

**KREMER, P. J.**—On October 19, 1988, Petra B. was declared a dependent child of the juvenile court pursuant to Welfare and Institutions Code section 300, subdivision (a)[1] and placed with her parents. At issue in this case is whether Petra B.'s health was in such danger as to justify intervention by the department of social services and the juvenile court. We agree with the parents that since the parent-child relationship is so important, the state should exercise great care before intervening and the state should not intrude into the relationship merely because it believes a certain kind of care or treatment is preferable; it is only when a child's health is actually and seriously threatened that the state should intervene. We find this a close case, one that, perhaps, might have been better handled by pursuing a plan of voluntary cooperation between the parents and the department. Nonetheless, we conclude the department and the juvenile court were not unreasonable in deciding there was a real and serious danger to Petra's health which justified intervention and, therefore, we affirm.

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.

FACTS

On August 4, 1988, Petra was accidentally burned on her face, neck and upper chest. The burns covered 4 percent of her body. The incident was an accident and did not involve any parental negligence.

Petra's parents elected to treat Petra with wheat germ oil, Golden Seal, comfrey, myrrh, and cold water. Petra's mother believed "God created the herbs for our use, and that he created our body to repair themselves." The parents did not take Petra to the hospital because they did not believe Petra's condition was serious.

On August 12, eight days after the initial injury, the parents were contacted by a social worker and Petra was taken to the University of California at San Diego Medical Center. She was examined by Dr. Gregory Senofsky, chief resident of the burn unit. He found the majority of the wounds (a deep dermal burn) had "no significant budding or evidence of healing." He also found Petra had an infection, which he rated a five on a scale of one to ten. He testified it was unlikely the infection would have improved without intervention. He prescribed antibiotics for the infection. Because the wounds were too deep to heal, skin grafts were performed by plastic surgeons "to get coverage, and prevent infection." Dr. Senofsky thought revision surgery for cosmetic reasons might be advisable at some date in the future.

On August 15, 1988, the department filed a petition under section 300, subdivision (a) seeking to declare Petra a dependent child because her parents were failing to provide adequate medical care. The detention hearing was held on August 17 and Petra was placed in a foster home. In the social study for the jurisdictional hearing, the department noted the family had an alternate lifestyle which was not the department's concern "unless that lifestyle places a child at risk for abuse or neglect," a situation which the department believed existed here. The department recommended Petra be declared a dependent child of the juvenile court, be placed with her parents, comply with a maintenance plan which included requirements the parents complete first aid and parenting programs.

On October 19, 1988, following a hearing, the court declared Petra a dependent child of the juvenile court pursuant to section 300, subdivision (a). The court, in determining whether the parents' failure to obtain medical treatment was reasonable or justifiable under the circumstances noted two explanations had been offered: (1) a "cultural learning and training that the mother ascribes to, and that is a wait-and-see attitude, to see how serious the injury gets before seeking formal or more significant hospital interven-

tion" and (2) the herbal treatment. The court found neither explanation justified the parents' failure to obtain medical treatment for Petra.

As to the "cultural learning and training," the court stated "it's certainly a reasonable position to take in some areas of the world, [but] in San Diego, where emergency clinics and hospitals abound, I don't think it's reasonable. . . . [A] wait-and-see attitude is not the right kind of attitude to take, considering these kinds of injuries."

The court stated the herbal treatment might have been reasonable if the burns had been mild but here the burns were serious and the parents should have recognized that. The court noted "there is a wide spectrum of how parents react to injuries that children have," ranging from "where parents run to the emergency room for every cough a child has, which is as unreasonable as the other [end of the] spectrum, where a child can have broken bones and the parent does nothing." The court explained this case did not fall at either end of the spectrum, with the parents either interpreting the symptoms as mild and treating them accordingly "with what they naive'ly [sic] thought was appropriate" or "[a]t worse, they appreciated the severity of the injuries and didn't act appropriately."

In concluding, the court stated: "Parents, this is a very difficult case, because it's such a borderline case. I can certainly understand your conduct and the sequence of events that led to you being here. And under other circumstances, the matter might never have seen the inside of this courtroom. For example, if the severity of the injuries were not as great, if the injuries would have resolved, then certainly it would not have resulted in coming here.

"I think that the disturbing part to me is your reliance on methods of treatment that may be unconventional. You certainly have a lifestyle that is unconventional, and more power to you for that. I have no problem with that, whatsoever. But the one thing that disturbs me is the unconventional treatment, and I would caution you to not substitute unconventional treatment with conventional treatment—conventional medical opinion and treatment, when it comes to the care of your children.

"It's been represented to me that the two of you are very good parents, and we are going to make some orders for you to follow, and those orders are as follows: Petra will be declared a dependent child of the San Diego Juvenile Court, under the care, [custody] and control of the Department of Social Services, pursuant to Section 300a of the Welfare & Institutions Code. She will be placed with the parents. And the parents are ordered to comply with a maintenance plan that is consistent with this court's order.

"The court will order the parents to participate in a program of first-aid or similar program. That will be a program that will be referred to you by Mr. Smith for you to complete, to have you [become] more acquainted with first-aid issues and medical care issues."

At oral argument, counsel for all the parties stipulated the juvenile court had terminated its jurisdiction in June 1989, thus technically mooting the appeal. Counsel, however, urged us to consider the appeal on the merits rather than dismiss. Because we believe the case involves issues of public interest which are likely to recur, we elect to consider the appeal on the merits. (See *Ballard* v. *Anderson* (1971) 4 Cal.3d 873, 876-877 [95 Cal.Rptr. 1, 484 P.2d 1345, 42 A.L.R.3d 1392]; *Stroh* v. *Midway Restaurant Systems, Inc.* (1986) 180 Cal.App.3d 1040, 1048 [226 Cal.Rptr. 153].)

## DISCUSSION

### I

The parents contend there was insufficient evidence to establish Petra needed the protection of the juvenile court at the time of the hearing.

Section 300, subdivision (a) authorized the juvenile court to assume jurisdiction over a child "[w]ho is in need of proper and effective parental care or control and . . . has no parent or guardian willing to exercise or capable of exercising care or control, or has no parent or guardian actually exercising such care or control." ■ The department of social services (Department) has the burden of establishing that, at the time of the hearing, the child is then in need of the juvenile court's protection. (*In re Katrina C.* (1988) 201 Cal.App.3d 540, 546 [247 Cal.Rptr. 784]; *In re Melissa H.* (1974) 38 Cal.App.3d 173, 175 [113 Cal.Rptr. 139].) ■ In determining whether the child is in present need of the juvenile court's protection, the court may consider past events. (*In re Michael S.* (1981) 127 Cal.App.3d 348, 358 [179 Cal.Rptr. 546].)

■ The parents argue Petra was not in need of the juvenile court's protection at the time of the hearing because Petra was no longer in any danger of infection or other complications from the wounds. The issue before the court, however, was not merely whether the wounds had healed but whether Petra's parents were capable of exercising and willing to exercise proper medical care. Evidence in the record indicates the parents, at the time of the hearing, were not capable of exercising or willing to exercise proper medical care. The evidence at the hearing indicated that the parents had known their herbal remedy was ineffective in treating Petra's wounds because they had observed the lack of healing of the deep wound yet they

did not take Petra to a doctor. They were waiting to see if Petra's wounds would worsen or continue not to heal. Petra's mother stated she would have taken Petra to a doctor if the infection had grown serious or if "the wound didn't heal for months and months." Petra's mother stated she was monitoring Petra's temperature with her hand. She did not use a thermometer because she felt a thermometer was necessary only if the "child's eyes are glossy, he's sweating, his face is red and flushed, and there's no appetite, and there's obvious discomfort," i.e., only if the child were running a very high fever. When Petra's mother was asked if, after hearing the doctor's comments about the infection risk, she would take her daughter to a hospital if a similar incident were to occur in the future, the mother answered yes—to avoid dealing with the Department again.

This evidence was sufficient to support the trial court's assumption of jurisdiction. The evidence indicated that at the time of the hearing, the parents continued to believe the herbal treatment was an adequate treatment despite their recognition it had been completely ineffective in healing Petra's deep wound and despite the doctor's statements about the risk of infection. This attitude of the parents and confusion about proper medical treatment posed a then-existing threat to Petra's well-being and justified the court's assumption of jurisdiction.

## II

■ The parents also contend the Department's involvement, even in the initial stage, was an unwarranted governmental intrusion into the family in violation of the family's constitutional right to privacy.

■ Parental autonomy is constitutionally protected. (*In re Phillip B.* (1979) 92 Cal.App.3d 796, 801 [156 Cal.Rptr. 48].) "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." (*Prince* v. *Commonwealth of Massachusetts* (1944) 321 U.S. 158, 166 [88 L.Ed. 645, 652, 64 S.Ct. 438].) "Inherent in the preference for parental autonomy is a commitment to diverse lifestyles, including the right of parents to raise their children as they think best." (*In re Phillip B., supra,* at p. 801.) As the parents point out, this commitment to diverse lifestyles is statutorily recognized in section 16509 which provides: "Cultural and religious child-rearing practices and beliefs which differ from general community standards shall not in themselves

create a need for child welfare services unless the practices present a specific danger to the physical or emotional safety of the child."[2]

■ The record here shows the parents did not oppose conventional medical treatment based on religious or cultural grounds. The mother stated she was not opposed to hospitals and would have taken Petra to a hospital "if the infection seemed to grow serious" or if "the wound didn't heal for months and months." She explained that growing up in Norway, "In my family, we always—we were calm, waited to see—when an accident happened, we would be calm and we would wait around, because to go to a hospital, we would have to make a day's trip with a boat, and it's a big decision. So we usually waited to see if it was necessary, and that's [what] we did in this case, too."

In other words, Petra's parents did not seek conventional medical treatment not because they had a religious or cultural opposition to conventional medical treatment but because they believed Petra's condition was not serious enough to warrant taking her to a hospital. Their decision not to take Petra to the hospital was based on their medical assessment of Petra's physical condition, not on a religiously or culturally based opposition to hospitalization.

■ ■ Further, while parental autonomy is protected by both statute and the Constitution, that autonomy is not absolute. As the court explained in *In re Phillip B., supra,* 92 Cal.App.3d 796, 801-802: "Parental autonomy, however, is not absolute. The state is the guardian of society's basic values. Under the doctrine of *parens patriae,* the state has a right, indeed, a duty, to protect children. [Citation.] State officials may interfere in family matters to safeguard the child's health, educational development and emotional well-being.

"One of the most basic values protected by the state is the sanctity of human life. [Citation.] Where parents fail to provide their children with adequate medical care, the state is justified to intervene. However, since the state should usually defer to the wishes of the parents, it has a serious burden of justification before abridging parental autonomy by substituting its judgment for that of the parents.

"Several relevant factors must be taken into consideration before a state insists upon medical treatment rejected by the parents. The state should

---

[2] See also section 300.5, providing: "In any case in which a minor is alleged to come within the provisions of Section 300 on the basis that he or she is in need of medical care, the court, in making such finding, shall give consideration to any treatment being provided to the minor by spiritual means through prayer alone in accordance with the tenets and practices of a recognized church or religious denomination by an accredited practitioner thereof."

examine the seriousness of the harm the child is suffering or the substantial likelihood that he will suffer serious harm; the evaluation for the treatment by the medical profession; the risks involved in medically treating the child; and the expressed preferences of the child. Of course, the underlying consideration is the child's welfare and whether his best interests will be served by the medical treatment."

 Even if we were to construe the record as indicating the parents were opposed to the medical treatment on religious or cultural grounds, we would not reverse. Petra, without the medical intervention, faced a substantial risk of harm from infection in the deep, nonhealing wound. The treatment involved was not a high risk medical procedure and was not strongly opposed by the parents. The Department's intrusion into the family was amply justified by the best interests of Petra which was to receive prompt and adequate medical care.

 The parents complain the maintenance plan that the court ordered them to comply with, a boilerplate document given to all parents of dependent children, "is highly intrusive and insulting in the context of the circumstances presented by this case." The parents point to the provision ordering the parents to have appropriate bedding, toys, and clothes for their children, "enough furniture so that all family members can sit down for meals" and that the child exhibit "socially acceptable hygiene." We agree with the parents that the maintenance agreement contains provisions which are, at best, surplusage and, at worst, demeaning. If the juvenile court had not terminated its jurisdiction, we would seriously consider striking these conditions or remanding the matter to the juvenile court to reconsider them. We do not because this issue has truly been mooted by the juvenile court's termination of jurisdiction.

We also observe that it is preferable for the individual concerned with unwarranted boilerplate or offensive conditions in a juvenile court order to promptly draw those conditions to the attention of the court especially when, as in this case, the court appeared sensitive to the parents' concerns and expressed a willingness to tailor the order to meet the particular circumstances (e.g., the court substituted a condition the parents attend a first aid class for the parenting class condition). This approach not only expedites the resolution of such matters but reduces unnecessary hostility between the parents and the Department ultimately resulting in a more productive relationship.

## Disposition

The judgment is affirmed.

Wiener, J., and Todd, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 28, 1990.