CURTIS, J.
 

 These two causes were argued and submitted together. As they involve the identical legal question, they will be considered and decided in one opinion. The legal question therein presented is whether chapter 304 of the Statutes of 1937 (Stats. 1937, p. 665) is an urgency measure and, therefore, not subject to referendum petition under the terms of section 1, article IV, of the Constitution.
 

 The title to this act is as follows: “An act relating to certain State lands and the production and disposition of oil, gas and other hydrocarbon substances therefrom, providing for the condemnation of real property, rights of way, easements and other interests therein for the purposes of this act, repealing all acts or parts of acts inconsistent or in conflict therewith, declaring the urgency thereof, and providing that this act shall take effect immediately. ’ ’
 

 As indicated by its title, the act relates to certain lands owned by the state which are capable of producing oil, gas and other hydrocarbon substances. In section 1 of the act, these lands are referred to more definitely as “certain tide and submerged lands at Huntington Beach, Orange County ’ ’, and
 
 *640
 
 are described by metes and bounds. By section 2' of the act, it is recited that the oil and gas deposits in said land's are being constantly drained by oil wells drilled in, and operating on, private property situated adjacent thereto, and that the protection of the public interest requires the development of said lands and the production and removal of the oil, gas and other hydrocarbon substances therefrom for the benefit of the state. Section 3 provides that, “The Director of Finance is hereby authorized and directed to secure the development, extraction, removal, and sale of oil, gas and other hydrocarbon substances from said lands for the benefit of the State in the manner hereinafter provided.” Section 5 of the act gives to the director of finance the power and authority to acquire by condemnation, or otherwise, any real property and any right of way necessary or desirable for the convenient access to said' state lands for the purpose of development of the same. Sections 6 to 25, inclusive, of the act, provide for the leasing of said land and lay down a procedure to be followed in the leasing of said land by the director of .finance and those desiring to make leases thereof. All persons desiring to lease any parts of said land may file bids for such leases, and in the event no bid's are received, the director of finance may again call for bids, or with the consent and approval of the governor of the state, may immediately proceed to drill wells on said lands for and on behalf of the state, and to that end may purchase all necessary equipment for the prosecution of said work. The work of drilling and construction work connected therewith, if done by the state, may be performed under contract let to the lowest bidder. All gas, oil, or other hydrocarbon substances from said wells belonging to the state shall be sold by the director of finance. Section 27 provides for the repeal of all acts inconsistent or contrary to the enacted statute. By section 28 of the act it is declared that it is deemed necessary for the immediate preservation of public peace, health, and safety, and that said measure “shall take effect immediately”, and a statement of facts constituting such necessity is set forth in said section of said act.
 

 In the proceeding against the secretary of. state, being L. A. No. 16472, the petitioner alleges the passage and approval of chapter 304 of the Statutes of 1937; that the director of finance has advertised for bids for leasing said lands;
 
 *641
 
 that bids have been received by him for leases thereof, and that a time has been fixed for the opening of said bids; that respondent secretary of state has received from the registrars and county clerks of the several counties of the state copies of a purported petition to submit to a vote of the people at the next general election in the state under the referendum provision of the Constitution, said measure, designated as chapter No. 304 of the Statutes of the legislature of 1937; that said respondent has issued his certificate that said referendum petition has qualified as a measure to be submitted to a vote of the people; and that said respondent will, unless otherwise ordered by the court, submit said proposed referendum measure to the electors of the state at the next general election in the state of California. Petitioner asks for a writ of mandate directed to the respondent secretary of state commanding him not to submit said purported measure to a vote of the people of the state.
 

 In the proceeding against the state controller, L. A. No. 16473, petitioner alleges that said chapter 304 was enacted by the 1937 legislature; that in the performance of his duties under said statute he, as director of finance, has purchased certain supplies required by the terms of said statute for which he has filed with said respondent controller a claim against the state of California, and that said controller has refused to audit or allow said claim or any part thereof, and has refused to issue his warrant upon the state treasurer in payment of said claim. In this proceeding, petitioner seeks a writ of mandate commanding the respondent, state controller, to audit and approve said claim and to issue his warrant for the amount thereof upon the state treasurer.
 

 A general demurrer was interposed to the petition in each of said proceedings, and the two causes have been submitted for decision upon briefs filed by the respective parties. In their briefs, the two respondents contend that chapter 304 of the Statutes of 1937 is subject to the referendum provision of the Constitution of this state (see. 1, art. IV), that an adequate and legal petition has been duly filed requiring said act to be submitted to the vote of the people of this state at the next general election for rejection or approval, and that said act does not go into effect until approved by a majority of the electors of the state voting thereon. Peti
 
 *642
 
 tioner does not question the sufficiency of the said referendum petition, but contends that chapter 304 is not subject to the section of the Constitution providing for the filing of referendum petitions against acts of the legislature, and that chapter 304 became effective at the date of its enactment, as expressly provided therein.
 

 Those portions of article IV, section 1, of the Constitution relative to the issues herein, are as follows:
 

 “The second power reserved to the people shall be known as the referendum. No act passed by the legislature shall go into effect until ninety days after the final adjournment of the session of the legislature which passed such act, except acts calling elections, acts providing for tax levies or appropriations for the usual current expenses of the state, and urgency measures necessary for the immediate preservation of the public peace, health, or safety, passed by a two-third's vote of all the members elected to each house. Whenever it is deemed necessary for the immediate preservation of the public peace, health or safety that a law shall go into immediate effect, a statement of the facts constituting such necessity shall be set forth in one section of the act, which section shall be passed only upon a yea and nay vote, upon a separate roll-call thereon; provided, however, that no measure creating or abolishing any office or changing the salary, term or duties of any officer, or granting any franchise or special privilege, or creating any vested right or interest, shall be construed to be an urgency measure. Any law so passed by the legislature and declared to be an urgency measure shall go into immediate effect. ’ ’
 

 It is well settled in this state, and in most other jurisdictions where the question has been the subject of judicial consideration, that the determination of the existence of a public necessity for the enactment of an urgency measure rests upon the judgment of the legislature. It is said to be purely a legislative question, the determination of which will not be interfered with by the courts, save in those few exceptional cases where it appears clearly and affirmatively from the legislature’s statement of facts that a public necessity does not exist.
 
 (Hollister
 
 v.
 
 Kingsbury,
 
 129 Cal. App. 420 [18 Pac. (2d) 1006];
 
 In re McDermott,
 
 180 Cal. 783 [183 Pac.
 
 437]; Roy
 
 v.
 
 Beveridge,
 
 125 Or. 92
 
 [266
 
 Pac.
 
 230]; Arkansas Tax Com.
 
 v.
 
 Moore,
 
 103 Ark. 48 [145 j3. W. 199];
 
 *643
 

 State
 
 v.
 
 Carter,
 
 257 Mo. 52 [165 S. W. 773].) The legislature having determined by the declaration contained in said act that the enactment of said statute was necessary for the immediate preservation of the public peace, health and safety, and the determination of the legislature of the existence of such necessity being conclusive upon the courts, we are precluded in these proceedings from further questioning the necessity for such legislation. All parties to these proceedings are in agreement as to this proposition.
 

 While the legislature is given the power to declare when the necessity exists for the enactment of an urgency measure, it is expressly provided in said section of the Constitution that: “No measure creating or abolishing any office, or changing the salary, term or duties of any officer . . . shall be construed to be an urgency measure.” Respondents contend that chapter 304 changes the duties of the director of finance and therefore under the referendum provision of the Constitution said statute “shall not be construed as an urgency measure”. Petitioner in answer to this contention argues that the statute does not change the duties of the director of finance or of any other officer of the state. As the duties of no other officer of the state are affected by this statute, except those of the director of finance, it will only be necessary to consider said act in so far as it affects the duties of such officer.
 

 As indicated by the brief references to the various sections of said statute, the director of finance is given quite extensive powers by the terms of said act. Not only is he made the agent and representative of the state in the leasing of said oil-producing lands and as such given direct charge of all leases under the act, but in case no bids are received for the leasing of said lands, the director of finance, with the consent and approval of the governor, may “proceed immediately with the drilling of wells thereon for and on behalf of the state for the production, removal, and disposal of oil, gas and other hydrocarbon substances therefrom”. This drilling of said lands may be done under contract, or it may be carried on directly by the state. In either of such events, the director of finance represents the state in all such operations, and, furthermore, it is made his duty to sell to the highest bidder all oil, gas, or other hydrocarbon substances produced.
 

 
 *644
 
 In order to determine whether the duties of the director of finance have been changed by the enactment of chapter 304, it will be necessary to review the history of the legislation creating the office of director of finance and prescribing his duties. The office of director of finance was created in the year 1927. (Sec. 655, Pol. Code; Stats. 1927, chap. 251, p. 449.) Under this act of the legislature (chap. 251), the various duties of this officer were defined. This act added a new article to chapter III of title I of part III of the Political Code, and embraced sections 654 to 685, both inclusive, of said code. Section 657 of the Political Code, as embraced within said act, provided that the director of finance as head of the department of finance should perform all duties, exercise all powers and jurisdiction, assume and discharge all responsibilities and carry out and effect all purposes now or hereafter vested by law in the department of finance, except such duties, powers, jurisdiction, responsibilities and purposes as were by said act specifically vested in the board of control. We do not find that said act vested in the board of control any duties respecting the leasing of land belonging to the state. Section 675 of the Political Code, embraced in said act, gave to the director of finance the power to lease “with the consent of the State Department, board, commission or officer concerned” real or personal property belonging to the state under certain conditions not necessary to here state. Evidently this section of the code thus enacted gave the director of finance no authority to lease oil-bearing or other mineral lands of the state. In 1929 the office of surveyor-general was abolished arid the department of finance succeeded to the duties and powers of that office. (Pol. Code, sec. 690; Stats. 1929, p. 892.) Section 675 of the Political Code was amended in the same year. (Stats. 1929, p. 894.) By the amended section, the director of finance’s power to lease state lands was made more specific but did not include the power to lease oil lands. In 1931 said section 675 was amended by the enactment of two sections, each numbered 675 and published in the Statutes of 1931 as chapters 325 and 326, respectively. (Stats. 1931, pp. 845 and 851.) These amendments were enacted and approved on the same day and accordingly would have gone into effect on the same date unless a referendum petition was filed against one of them. Section 675 as amended by
 
 chapter 325
 
 
 *645
 
 contained ten subdivisions, the first eight of which were practically identical with those contained in section 675 as amended in 1929. The ninth subdivision referred to land of the state abutting on abandoned river channels and is not relevant to any question involved herein. The tenth subdivision of said section gave to the director of finance authority to lease “any land belonging to the state or in which the state has an interest, for the production of minerals, oil, gas or other hydrocarbons”. By
 
 chapter 326
 
 of said statutes, section 675 of the Political Code was amended so that it read precisely like said section as amended by chapter 325, except that subdivision 10 contained in chapter 325 was omitted from said section as amended by chapter 326. A petition under the referendum provision of the Constitution was filed asking that chapter 326 be submitted to the vote of the people. At a special election held on May 3, 1932, it received a favorable vote of the people, and accordingly went into effect five days after the date of the official declaration of said vote by the secretary of state. As the effective date of chapter 326 was long subsequent to the effective date of chapter 325 of the laws of 1931, chapter 326 must be held to be the later statute and, therefore, it repealed by implication all provisions of chapter 325 inconsistent with those of chapter 326. We find no authority directly supporting this statement, and none has been called to our attention. On the other hand, we know of no authority holding a contrary view. We think, however, that no other reasonable conclusion can be sustained. The two statutes were enacted on the same day. Chapter 325 went into effect ninety days after the adjournment of the legislature. A referendum petition was filed against chapter 326. The Constitution provides that upon the filing of a referendum petition, “No such act shall go into effect until and unless approved by a majority of the qualified electors voting thereon.” Chapter 326 was ineffective, therefore, until approved by the electors of the state and the official declaration of the result of said vote by the secretary of state. Five days after such declaration the act for the first time became effective. It necessarily, and by all rules of statutory construction, repealed by implication all acts inconsistent with its provision at that date. If the legislature should enact two statutes upon the same subject-matter, the terms of one of which were different and
 
 *646
 
 inconsistent with the terms of the other, and one of said statutes became effective ninety days after the adjournment of the legislature, and the other was made effective one year after said date, the first of said statutes would control said subject-matter until the effective date of the second statute when the provisions of the second statute would supersede all provisions of the first statute inconsistent with those of the second. In effect, this is the situation respecting chapter 325 and chapter 326. The latter under the Constitution of this state having been made effective at a date subsequent to the effective date of the former, takes precedence over the former and governs the subject-matter of such legislation. It is to be noted that the only difference in the two enactments was the omission of subdivision 10, found in chapter 325, from chapter 326. Where a statute is revised and some parts omitted, and it is clearly the intention to cover the whole subject by the statute, the omitted parts are considered as repealed or annulled.
 
 (Wood
 
 v.
 
 Roach,
 
 125 Cal. App. 631 [14 Pac. (2d) 170];
 
 Mack
 
 v.
 
 Jastro,
 
 126 Cal. 130, 131, 133 [58 Pac. 372];
 
 Carter
 
 v.
 
 Stevens,
 
 208 Cal. 649 [284 Pac. 217].) Both chapter 325 and chapter 326 purport to cover the whole subject of the duties and powers of the director of finance respecting the leasing of land belonging to the state, and when the subsequent act omitted subdivision 10, found in chapter 325, both reason and authority would indicate that it was the intention of the legislature to withdraw from the director of finance those powers granted to him by said subdivision 10 of chapter 325.
 

 Not only did chapter 326 repeal and supersede chapter 325, but also, being a special act fixing the duties of the director of finance, it superseded the general duties imposed upon that officer by section 657 of the Political Code which, as we have seen, was enacted in 1927, and gave to the director of finance all the powers and duties vested in the department of finance. (23 Cal. Jur., p. 708.)
 

 It might be well to make further reference to certain legislation respecting the leasing of tide and overflowed lands belonging to the state. The Mineral Land Act of 1921, section 8 (Stats. 1921, p. 408) gave to the surveyor-general the authority to lease such lands on a royalty basis. The director of finance subsequently succeeded to these powers. But by subsequent legislation these powers were suspended
 
 *647
 
 and the surveyor-general was deprived of all such powers and authority. (Stats. 1929, p. 11; also, p. 945.) By section 24 of this later act, the legislature in express terms deprived every state officer of any and all power to lease any tide or submerged lands for the drilling of oil and gas. These statutes were in force up to the date of the enactment of chapter 304.
 

 That chapter 304 made a material and substantial addition to the duties of the director of finance over those existing and conferred upon him prior to the enactment of said statute cannot, we think, be successfully challenged. Prior to that date he had no duty to perform in reference to the leasing of the lands of the state for the production of oil, gas, or other hydrocarbon substances. In fact, he and all other officers of the state were prohibited from leasing any of the tide or submerged lands of the state for the drilling of oil and gas. By chapter 304 he is given extensive powers and corresponding duties not only in the leasing of the lands described in the act, but under certain conditions it is made his duty to proceed with the drilling of wells on said lands for and on behalf of the state for the production of oil and gas therefrom.
 

 The word “change” has various shades of meaning depending upon the subject-matter to which it is applied. Petitioner contends that the mere addition of duties to those already imposed upon an officer is not a change in his duties. He cites the definition of the verb “to change”, as given in Webster’s New International Dictionary as follows: “to alter by substituting something else for; or by giving up for something else; to put or take another or others in place of; to make substitution of, for, or among”. As an illustration of this meaning we might refer to the use of the word “change” in the well-known legal term “change of venue”, which implies the substitution of another place of trial for the place of trial in which the action is pending. Other standard works are cited by petitioner giving to the word “change” the same meaning as given by Webster. Petitioner also cites authorities showing that the word “change” is frequently used as meaning “substitution”, “exchange”, or “to put one thing in place of another”. It is in this sense petitioner contends that the word “changing” is used in the section of the Constitution in which the people of the
 
 *648
 
 state reserved to themselves the power to refer acts of the legislature to a vote of the electors of the state. It is argued, therefore, that a statute which merely imposes additional duties upon an officer is not such a change in his duties as to bring the statute within the provision mentioned in sa¿d section of the Constitution.
 

 Another meaning of the verb “to change” given by Webster is “to alter; to make different”. It is in this sense that the word is used when referring to a change in the by-laws or the articles of incorporation of a corporation. As so used, unquestionably any substantial addition to either of these instruments would certainly be deemed to be a change therein, and could only be made by the mode prescribed by law. It is in this sense the respondents contend that the word “changing” is used in said section of the Constitution.
 

 An examination of the language of said section we think shows clearly that it is in this latter sense that the word “changing” is used in said section. The pertinent part of said provision reads as follows: “No measure . . . changing the salary, term or duties of any officer . . . shall be construed to be an urgency measure.” We think it will not be contended that the increase or decrease in the salary of an officer is not a change in his salary. It is equally apparent that any increase or diminution in the term of an officer is a change in his term. As the three words “salary”, “term”, and “duties” not only occur in the same sentence but grammatically are objects of the same participle, “changing” the same meaning must be given to the participle when applied to one of these objects as when applied to the others. It is clear, therefore, that when we look at the text in which this phrase appears, the word “changing”, when considered in its connection with the words “duties of any officer”, must mean any increase or addition to the duties of such officer. In our opinion, no other reasonable construction can be given the word “changing”, as used in said section of the Constitution.
 

 The fact that the legislature has enacted many other statutes which change the duties of an officer and has purported to make such statutes emergency measures, cannot under the rule of legislative construction, avail the petitioner in these proceedings. The provision of the Constitution
 
 *649
 
 declaring that no measure changing the salary, term, or duties of any officer shall become an urgency measure is an express limitation upon the legislature in such matters, and we know no rule of law which holds that the repeated violation of a statute, or constitutional provision, by an individual or body, the actions of whom the statute or constitutional provision was designed to curb or limit, would change the meaning of such a statute or place a construction thereon not in fact to be found in the statute or constitutional provision.
 

 We are also unable to agree with the contention of petitioner that a measure which the legislature has declared to be an urgency measure, but which in fact is not, goes into effect immediately upon its enactment and remains effective for all purposes even if a referendum petition is filed against it, until it is rejected by the voters of the state. This contention is against the plain terms of the Constitution which provides that a statute against which a referendum petition is filed, goes into effect upon a favorable vote thereon, five days after official declaration of said vote. Respondents, on the other hand, contend that any act passed by the legislature even though declared to be an urgency measure, and which is in fact such a measure, is subject to the referendum provision of the Constitution that it goes into effect immediately, but upon an adverse vote of the people, after a referendum petition has been filed against it, ceased to be of any effect. It is not necessary for us to pass upon this contention, for we are dealing with a statute which is not an urgency measure, and which, therefore, is subject to the referendum filed against it, and, therefore, is ineffective until there is a favorable vote thereon and a declaration of such vote by the secretary of state.
 

 It is not for us to speculate as to the reason for the insertion in the Constitution of the provision which prohibits the legislature from enacting as an urgency measure a statute changing the salary, term, or duties of any officer. Whether the purpose of the legislature in proposing this section of the Constitution, or of the people who voted for its adoption, was to restrain “a complaisant legislature, subservient to powerful but evil influences”, from awarding “an unfaithful public servant”, or from punishing “one who was inexorably faithful to his trust”, as contended by peti
 
 *650
 
 tioner, is not within our province to determine. We have nothing to do with the policy of the law as expressed in this section of the Constitution, and can neither approve nor condemn the same. Our duty begins and ends with the interpretation of the language so used in the Constitution, and with ascertaining the meaning thereof. This we have attempted to do, regardless of the reasons which may have prompted those responsible for the enactment of this provision of the Constitution.
 

 Neither can we in placing a construction upon this section of the Constitution consider the result of our decision upon the rights of those concerned in this litigation or upon the interest of the state, however vital those interests may be. The legislature determined, and the petitioner alleges, that owners of land adjacent to those belonging to the state and described in chapter 304 are by means of wells draining valuable oil and gas deposits from the state-owned lands, and that the state for that reason is daily suffering great loss and damage by being deprived of revenues which it would receive if permitted to lease said lands or otherwise develop the same under the provisions of said act of the legislature. We must assume that this determination of the legislature and these allegations of the petitions are true. The delay in the development of the state lands described in the statute and in pursuance thereof may result in daily loss to the state of a considerable proportion of its revenue. These considerations can have no bearing upon the duty of the court which is simply to declare the meaning of a provision of the Constitution regardless of the consequences that may follow. In this connection it might be stated that the power to lease these very lands was in 1929 withdrawn from any and all state officials, and these lands lay idle for eight years before the enactment of chapter 304 of the Statutes of 1937. It may be a source of regret that this condition, by reason of the limitation placed upon the power of the legislature to enact urgency measures, must continue for a few months longer.
 

 Respondents have attacked chapter 304 upon other grounds than that discussed above. Our conclusion that the statute is not an urgency measure renders the discussion of these other grounds unnecessary.
 

 
 *651
 
 The alternative writ, issued in each of these proceedings, is annulled, and the petitions are, and each of them is, denied.
 

 Langdon, J., Waste, C. J., Shenk, J., and Edmonds, J., concurred.