[Civ. No. 13413. Third Dist. Feb. 20, 1973.]

CALIFORNIA MEDICAL ASSOCIATION et al.,
Plaintiffs and Respondents, v.
EARL W. BRIAN, as Director, etc., et al., Defendants and Appellants;
OLGA O'REILLY et al., Interveners and Respondents.

**COUNSEL**

Evelle J. Younger, Attorney General, Elizabeth Palmer, Assistant Attorney General, N. Eugene Hill and John Fourt, Deputy Attorneys General, for Defendants and Appellants.

Hassard, Bonnington, Rogers & Huber, Laurence W. Kessenick, David E. Willett and Howard Hassard for Plaintiffs and Respondents.

Sheldon L. Green, Peter David Coppleman and Philip Neumark for Interveners and Respondents.

OPINION

REGAN, J.—On January 13, 1971, plaintiffs California Medical Association, et al. (hereafter "CMA"), filed a complaint against defendants Earl W. Brian, M.D., as Director,[1] Department of Health Care Services (hereafter "Brian" or "DHCS"), and the State of California, seeking to enjoin the implementation of certain Medi-Cal regulations which were filed by Brian on December 11, 1970, to take effect on December 15, 1970. These regulations curtailed the medical benefits available under the Medi-Cal program and the CMA contended that such regulations were invalid. CMA filed an amendment to its complaint on March 1, 1971, seeking to invalidate certain drug-product regulations issued February 11, 1971, and to enjoin their implementation by Brian.

Interveners Olga O'Reilly, et al. (hereafter "O'Reilly"), filed their complaint on January 19, 1971. O'Reilly sought an injunction restraining Brian from implementing the December 15, 1970, regulations. O'Reilly is a recipient of categorical cash grants under the joint state and federal welfare system.

Interveners California Dental Association (hereafter "CDA") filed their complaint on February 1, 1971. The CDA sought to invalidate the December 15, 1970, regulations and to enjoin their implementation.

All parties stipulated that the cause should be heard on the merits and not on motions for preliminary injunction. After a trial before the court lasting approximately 18 days, the court made extensive findings of fact and conclusions of law. In effect, the court held that the Medi-Cal regulations and the drug formulary regulations were invalid since they were not promulgated in accordance with law. The court's judgment further enjoined Brian from enforcing such regulations and from "any reenactment, adoption, or revision of said Regulations or Guidelines or any part or portion thereof, substantially like the Regulations or Guidelines herein cited or any part of them, which adoption, reenactment, or revision is violative of the conclusions filed herein." This appeal followed.

We inquire into the contention of defendants that the case is moot, into the validity of the December 1970 Medi-Cal regulations, the February 1971 drug product regulations, as well as the permanent regulations of

---

[1] On August 30, 1972, a certified copy of an order of the superior court substituting Dwight M. Geduldig, Director of Health Care Services, as defendant-appellant in place of Earl W. Brian, M.D., was filed in this court. An order of such substitution was filed herein on said date.

April 1972, which were later repealed in July 1972. We consider our task here to be as stated succinctly in *Morris* v. *Williams* (1967) 67 Cal.2d 733, 737 [63 Cal.Rptr. 689, 433 P.2d 697]: "Accordingly, as required by long established and unassailable California precedents, we here discharge our responsibility to determine whether the Agency has acted in obedience to the mandate of the Legislature or has ignored or violated it. ■ Our function is to inquire into the legality of the regulations, not their wisdom. Nor do we superimpose upon the agency any policy judgments of our own. ■ Administrative regulations that violate acts of the Legislature are void and no protestations that they are merely an exercise of administrative discretion can sanctify them. They must conform to the legislative will if we are to preserve an orderly system of government."

In 1965, the Congress added Title XVIII to the Social Security Act and thereby created "Medicare." (42 U.S.C. § 1395 et seq.) In Title XIX, the Congress enacted the "Medicaid" law. (42 U.S.C. § 1396 et seq.) "Medi-Cal" is this state's program enacted pursuant to the federal law. In order to obtain federal funding which became available to the states under Title XIX, the Legislature enacted what is commonly known as the "Medi-Cal Act." (Welf. & Inst. Code, § 14000 et seq.) (See *Morris* v. *Williams, supra,* 67 Cal.2d 733.)

As in any litigation concerning statutory programs, legislative intent is of paramount concern. It is clear that the legislative intent was to provide "mainstream" medical care to the indigent. In effect, this meant that poorer people could have access to a private practitioner of their choice, and not be relegated to a county hospital program. This intent is exemplified by the following sections of the Medi-Cal Act. (Welf. & Inst. Code, § § 14000, 14000.2 and 14001.1.) "The purpose of this chapter is to afford health care and related remedial or preventive services to recipients of public assistance and to medically indigent aged and other persons, including related social services which are necessary for those receiving health care under this chapter.

"The intent of the Legislature is to provide, to the extent practicable; through the provisions of this chapter, for health care for those aged and other persons, including family persons who lack sufficient annual income to meet the costs of health care, and whose other assets are so limited that their application toward the costs of such care would jeopardize the person or family's future minimum self-maintenance and security. It is intended that whenever possible and feasible:

"(b) The means employed shall be such as to allow[2] . . . eligible persons to secure health care in the same manner employed by the public generally, and without discrimination or segregation based purely on their economic disability." (Welf. & Inst. Code, § 14000.)

The intent of the Legislature as to California's indigents was originally set forth in section 14152 of the Welfare and Institutions Code. This intention was reaffirmed in 1970 when it reenacted and renumbered section 14152 as section 14001.1: "It is the intention of the Legislature, whenever feasible, that the needs of recipients of public assistance for health care and related remedial or preventive services be met under the provisions of this chapter."

In order to provide mainstream medical services, and to eliminate the dependence on the county hospital concept, the Legislature also enacted section 14000.2, which provides as follows: "During the time this chapter is effective and notwithstanding other provisions of the Welfare and Institutions Code and Health and Safety Code, the board of supervisors of each county may prescribe rules which authorize the county hospital to integrate its services with those of other hospitals into a system of community service which offers free choice of hospitals to those requiring hospital care. The intent of this section is to eliminate discrimination or segregation based on economic disability so that the county hospital and other hospitals in the community share in providing services to paying patients and to those who qualify for care in public medical care programs. In prescribing rules under which the county hospital may provide community hospital services described in this section, the board of supervisors shall provide a basis under which patients may be attended by their own personal physicians who are professionally qualified for staff membership in the county hospital."

To take advantage of the liberal federal funding available, participating states are required to move toward the mainstream concept of medicine for indigents who are receiving categorical cash grants under state programs which are partially federally funded. (See *Morris* v. *Williams, supra,* 67 Cal.2d at pp. 738-740.) In this connection, the federal law provides: "The Secretary shall not make payments under the preceding provisions of this section to any State unless the State makes a satisfactory showing that it is making efforts in the direction of broadening the scope of the care and services made available under the plan and in the direction of liberalizing the eligibility requirements for medical assistance, with a view toward furnishing by July 1, 1977, comprehensive care and services to substantially all

---

[2]In 1971, subdivision (b) was amended to add the phrase "to the extent practicable," after the word "allow." (Stats. 1971, ch. 577.)

individuals who meet the plan's eligibility standards with respect to income and resources, including services to enable such individuals to attain or retain independence or self-care." (42 U.S.C. § 1396b, subd. (e).)

### The December 1970 Regulations.

The December regulations consisted of two separate orders, both filed by Brian as emergency regulations on December 11, 1970, to take effect on December 15, 1970. These regulations restricted the scope of benefits available under the Medi-Cal Program and were promulgated without the benefit of a public hearing. Accordingly, they were accompanied by a statement of facts purporting to illustrate the existence of a fiscal emergency. (See Gov. Code, § 11421, subd. (b).) The first group of regulations pertained to medical and health services,[3] while the second group created a new Medi-Cal drug formulary.

Under the Medi-Cal Act, the DHCS has the authority, with the advice of the Health Review and Program Council,[4] to determine which of the health care and related remedial or preventive services are "elective." (Welf. & Inst. Code, § 14103.4.) If a fiscal emergency should arise, the DHCS has the authority to place elective services under the requirement of "prior authorization." (Welf. & Inst. Code, §§ 14103.6 and 14120.)

The Medi-Cal Act also created a class of public employees known as "consultants," whose duty it is to pass on applications for prior authorization. (Welf. & Inst. Code, §§ 14103.6 and 14119.) For the most part, the DHCS assumed responsibility for employing the consultants (either physicians, dentists or pharmacists), and these consultants worked in 12 district offices located throughout the state.

The December regulations placed many medical services into the elective category and thus were subject to prior authorization by a state-employed (with a few exceptions)[5] Medi-Cal consultant. Providers of medical services were required to fill out a Treatment Authorization Request (hereafter "TAR") if the service fell into an elective category.[6]

---

[3]Public hearings on these regulations were held on March 29 and 30, 1971, in Sacramento. Thereafter, on April 13, 1971, Brian caused these temporary regulations to become permanent by complying wtih the Administrative Procedure Act. On June 30, 1971, regulations were filed which repealed the December 1970 regulations relating to medical and health care services.

[4]In 1971, the Legislature substituted "Care Commission" for "Review and Program Council."

[5]See Welfare and Institutions Code section 14119, which provides that in some instances a consultant can be a county employee.

[6]If the TAR was denied by a consultant, the provider would not be paid with federal-state funds under Medi-Cal if he proceeded with treatment.

A partial list of those services characterized as elective is as follows:

(1) More than two visits per month to a physician's office required prior authorization;

(2) Out-patient psychiatric services of more frequency than one visit within a six-month period required prior authorization;

(3) Dental services required prior authorization;

(4) Services of optometrists required prior authorization;

(5) All out-patient psychology services required prior authorization;

(6) All nonemergency hospitalization was subject to prior authorization.

The December regulations also imposed the following standard: "51056.1. Elective Services. Elective services are those which generally can be postponed without seriously affecting the health of the person requiring the service. Postponement of elective services shall be accomplished by the Medi-Cal consultant determining, on review of authorization requests for services, which of such services must be provided within 90 days to prevent significant disability or death, and which of such services can be deferred 90 days or more without such deferment resulting in significant disability or death."

The consultant was thus authorized to refuse medical services if, in his or her opinion, the service could be postponed for 90 days without resulting in significant disability or death.[7] According to the testimony of the providers of services (e.g., M.D.'s) the phrase "significant disability" has no precise recognized medical meaning.[8] The evidence also showed that there was no uniformity in the various districts as to the approval or rejection of TAR's by the consultants. The offices of the consultants were not open nights, weekends or holidays.

Along with the December regulations, the DHCS also issued "Medi-Cal Consultant Guidelines." The definition of "Significant disability" was contained not in the regulations but in the guidelines:

---

[7] In this regard, the court made the following findings:

"28. The practical effect of the Regulations in redefining almost all non-emergency services as 'elective' is to repose the authority in the State Medi-Cal consultants to determine which medical or dental services are to be provided under the Medi-Cal Program.

"29. The evidence shows that the Regulations permit State Medi-Cal consultants to act arbitrarily and standards for approval or preference vary from area to area up and down the State, depending upon the attitude of the particular consultant."

[8] William M. Jenkins, M.D.: "I am sure that there are some disabilities that can be classified as significant. But what is significant to me might well not be significant to another physician."

*"A significant disability is one that precludes essential basic activities of daily living.* In this context, recreation, educational activities, engaging in employment, driving an automobile, and other such out-of-home activities are *not* included under 'essential activities of daily living.' "[9]

The related regulations had to do with a so-called "drug formulary." In essence, a drug formulary consists of a catalogue of drugs commonly used to treat various ailments. Such a formulary had been in effect prior to the December 1970 regulations and was, generally, acceptable to the providers of medical services. The December regulations[10] contained one major difference. Many of the drugs were marked by the typewriter symbol "#" and for want of a better word, were termed by defendants' Pharmaceutical Program Coordinator as "gidgeted" drugs. All such drugs required prior authorization before they could be dispensed. Any drug not listed on the formulary also required prior authorization.

A so-called standard was also set up for obtaining prior authorization of drugs. Generally, the clinical condition of the patient had to be "(1) . . . of such severity that it mandates the use of an unlisted drug or a drug subject to prior authorization to prevent significant disability or death and, (2) Listed drugs covered without prior authorization have been adequately considered or tried and were not effective."

### February Drug Formulary.

On February 11, 1971, subsequent to the filing of this action, defendants adopted an order amending the regulations concerning the drug formulary making some 76 changes. However, most of the December regulations requiring prior authorization remained unchanged.

On March 1, 1971, plaintiffs amended this complaint to include the February amendments. The providers, at trial, testified that the February formulary did not remedy many of the deficiencies found in the December formulary. The trial court found, in effect, that the February formulary did not correct the deficiencies contained in the December formulary.

---

[9]The trial court found that this definition exceeded the authority of the DHCS under section 14120, subdivision (c), of the Welfare and Institutions Code, relating to the postponement of elective services.

[10]According to a consultant health care administrator, testifying for Brian, no public hearings were held on the formulary since defendants did not feel such regulations came within the Administrative Procedure Act.

## The Trial.

As noted above, a trial was had on the merits. In the main, plaintiffs[11] attempted to prove the regulations were illegal as in conflict with the Medi-Cal Act, causing injurious impact on recipients and providers alike,[12] and that no fiscal emergency did in fact exist. Defendants, on the other hand, attempted to justify the regulations in view of a fiscal emergency as being in accordance with the provisions of the Medi-Cal Act.[13]

Brian, in this appeal, argues error on the ground of mootness in the superior court's review of the following:

(1) The validity of the Medi-Cal regulations and the consultant guidelines; and

(2) The sufficiency of the findings underlying the various temporary regulations.

Brian also contends the superior court erred in that:

(1) It failed to use the "substantial evidence" scope of review rule and also failed to review the administrative record of proceedings.

(2) It erred in entering its post-trial conclusion that the burden of proof rested with Brian.

Brian argues the court erred in striking down the regulations on the basis that the statement of emergency was insufficient in the following respects:

(1) The argued invalidity of the statement of facts and finding of emergency did not invalidate the April permanent regulations.

(2) The court erred in receiving evidence to impeach the facts recited in the section 11421, subdivision (a) [Gov. Code] statements.

(3) Substantial evidence supports the December 1970 finding of fiscal emergency.

(4) The court erred in finding that a potential fiscal deficit is not in itself an emergency.

He further contends the court erred in making the following findings:

---

[11]On this appeal, we are primarily concerned with the CMA and O'Reilly as plaintiffs.

[12]Apparently the major medical problems occurred in ghetto or barrio areas.

[13]The defendants claimed a $140,000,000 shortage in the funding available for Medi-Cal for the 1970-1971 fiscal year. Brian testified that this department operated under a "closed end budget," i.e., its appropriation was fixed.

(1) The December regulations and drug formulary violated the dollar limitations on prior authorization established by statute.

(2) The December drug-product formulary regulations to be unauthorized by statute.

(3) The "consultant guidelines" were issued without complying with the notice and hearing procedures of the Administrative Procedure Act.

(4) The consultant guidelines provided that medical treatment for employment or education was to be postponed.

(5) The December 1970 and February 1971 regulations violated the maintenance of expenditures provisions of the Medi-Cal Act.

(6) The December 1970 Medi-Cal program reduction regulations were invalid as failing to insure that those recipients most in need of selective services received them first within available funds.

(7) The court erred in striking down regulations on the basis of a supposed failure to consult with interested parties.

Brian also contends the actions by O'Reilly and CDA were barred by their failure to exhaust their available administrative remedies.

Finally, Brian contends the court erred in entering its injunctive order which was uncertain and ambiguous and which restrained him from exercising the discretion vested in him by law.[14]

### Findings of Fact and Conclusions of Law.

In general, the trial court made the following findings: The evidence failed to substantiate a fiscal emergency justifying promulgation of the emergency regulations. The regulations and guidelines prevent some necessary services from being rendered promptly and create administrative burdens for providers which are not in the best interests of recipients of care. The determination of which services were to be classified as elective was undertaken by the DHCS without any meaningful consultation with the Health Review and Program Council or representatives of providers. The broad categories of medical and dental care service and treatment classified as elective in the regulations was unreasonable, arbitrary and often contrary to the teachings

[14]In CMA's brief it counters Brian's contentions on four distinct points: (1) Mootness; (2) validity of the regulations; (3) failure to exhaust administrative remedies; and (4) ambiguity of the trial court's injunction. This is a more realistic appraisal of this case than that presented by Brian in his brief, even though CMA characterizes the issues as "complex and varied."

of medical science. The requirement that prior authorization be obtained for the prescription of numerous drugs (as set out in the formularies) has frequently caused such drugs to be unavailable to Medi-Cal recipients, and such a procedure is burdensome, onerous, and unreasonable. The composition of the drug formularies was determined without adequate notice to those California associations of pharmaceutical manufacturers affected by such action, and the advice of such associations was not sought or considered.[15]

Based upon these findings, the court concluded that there was no emergency and that the regulations were violative of state law. Judgment was entered accordingly.

### 1. *Mootness.*

■ Defendants set forth two alternative arguments in support of their contention that the case is moot. The first argument alleges that the case became moot when the December regulations and February amendments became permanent regulations on April 13, 1971, following a public hearing on March 29-30, 1971.[16] (See *Pitts* v. *Perluss* (1962) 58 Cal.2d 824, 831-832 [27 Cal.Rptr. 19, 377 P.2d 83].) Defendants' alternative argument alleges that the case became moot when the December regulations, the February amendments, and the Medi-Cal consultant guidelines were repealed on July 1, 1971. (Cf. *American Fruit Growers* v. *Parker* (1943) 22 Cal.2d 513, 514-515 [140 P.2d 23].)[17] In the abstract, defendants' argument is technically accurate, however, for reasons which we shall explain below, we have concluded that the case is not moot.

The trial court specifically held that emergency regulations which are void because of a conflict with a pertinent statute cannot be validated by a subsequent hearing. We think this accurately states the law. (*Morris* v. *Williams, supra,* 67 Cal.2d at p. 737.) Furthermore, to render the case moot would be, in effect, to nullify section 11440 of the Government Code which specifically provides emergency regulations may be challenged on the ground that the facts recited in the statement of emergency do not constitute such an emergency.[18]

---

[15]In view of its findings, the court found it unnecessary to reach or rule on the allegations that the regulations were violative of federal law. Additional findings were made as to plaintiff counties, but that appeal is being handled separately.

[16]See Government Code section 11422.1, setting forth requirements to make emergency regulations permanent. (Administrative Procedure Act.)

[17]Defendants allege the July 1, 1971, regulation restored the Medi-Cal program's scope of benefits to the pre-December 1970 levels.

[18]In this connection we note that defendants cannot justify the regulations as emergency measures if in fact (as the trial court found here) no emergency existed

Moreover, the Medi-Cal program is a statewide program affecting many recipients and providers alike. Where an action concerns an issue of great public interest that is likely to recur, an appellate court may exercise an inherent discretion to resolve the issue even though an event occurring during its pendency might normally render the matter moot. (*Ballard* v. *Anderson* (1971) 4 Cal.3d 873, 876-877 [95 Cal.Rptr. 1, 484 P.2d 1345, 42 A.L.R.3d 1392]; *DiGiorgio Fruit Corp.* v. *Dept. of Employment* (1961) 56 Cal.2d 54, 58 [13 Cal.Rptr. 663, 362 P.2d 487].)

### 2. *Substantial Evidence Rule.*

■ The defendants first contend the trial court erred in utilizing "the weight of the evidence" rule instead of the "substantial evidence" rule of judicial review in reaching its decision on this case, citing finding of fact No. 40 and conclusion of law No. 7. Assuming arguendo that the trial court did apply the wrong yardstick, we think it is clear from a reading of the extensive findings of fact that the court would have reached the same result, and thus no error occurred.

They next contend the court erred in failing to review the administrative record of proceedings. Defendants note that upon the filing of the April 13, 1971, certificate of compliance, the regulations in question became permanent. (Gov. Code, § 11422.1, subd. (a).) The issue before the court thereupon was whether the *permanent* regulations were valid. They contend judicial review of these permanent regulations was limited to an examination of the March 29 and 30, 1971, public hearings (*Pitts* v. *Perluss, supra,* 58 Cal.2d at p. 833.)

It is true that on the date of judgment, July 1, 1971, the "permanent" regulations were in effect. However, at the time of trial the temporary regulations based on a purported emergency were the subject in issue. It was agreed that the trial was to proceed on the merits and evidence was so taken. It appears strange that at this late date defendants now contend that judicial review was limited to a review of the public hearings which for the most part came after a rather lengthy trial. We find no error.

■ In its conclusions, the trial court states: "6. Defendants had the burden of proving that a $140 million deficiency in the Medi-Cal program for fiscal 1970-1971 was more probable than either a surplus, or a deficiency substantially less than $140 million, which burden was not met."

Defendants contend this was error since the burden of proving their case

---

and if such regulations conflict with the statutory provisions. (See *Morris* v. *Williams, supra,* 67 Cal.2d at pp. 748-749, 756-757.)

rests with plaintiffs (CMA and O'Reilly) throughout the case. In a very similar situation, the court in *Morris* v. *Williams, supra,* 67 Cal.2d at pages 760-761, rejected an almost identical contention. In *Morris,* the court states (at p. 760): "We have no doubt that the burden of going forward with the evidence on the issue of nonfeasibility properly belonged to defendants. Although a plaintiff ordinarily has the burden of proving every allegation of the complaint and a defendant of proving any affirmative defense, fairness and policy may sometimes require a different allocation. (See Evid. Code, § 500.) Where the evidence necessary to establish a fact essential to a claim lies peculiarly within the knowledge and competence of one of the parties, that party has the burden of going forward with the evidence on the issue although it is not the party asserting the claim. (*Garcia* v. *Industrial Acc. Com.* (1953) 41 Cal.2d 689, 694 [263 P.2d 8]; 9 Wigmore, Evidence (3d ed. 1940) § 2486; Witkin, Cal. Evidence (1958) § 56(b).) Clearly only defendants could explain why they deemed proportionate reductions not feasible, and the burden on this issue was theirs." For the reasons expressed in *Morris,* we think the burden relating to an alleged deficiency properly belonged to defendants. (See also finding No. 40 [plaintiffs have sustained their burden of proof on all issues].)

### 3. *Statement of Emergency.*

Defendants first contend the argued invalidity of the statement of facts and finding of emergency did not invalidate the April permanent regulations. This argument may be sound as far as it goes, but it neglects to point out that the trial court also held the regulations to be violative of specific provisions contained in the Medi-Cal Act.

█ Defendants contend the court erred in receiving evidence to impeach the facts recited in the statement made pursuant to section 11421 of the Government Code.[19] They state: "This conclusion [emergency not proven] follows from the erroneous action of the court below in refusing to accept the recital of facts in the statement as conclusive (absent an allegation of fraud), and in receiving evidence to impeach the § 11421(a) statements."

[19]Section 11421 reads: "(a) The provisions of this article shall not apply to any regulation not required to be filed with the Secretary of State under this chapter, and only this section and Section 11422 of this article shall apply to any regulation prescribing an agency's organization or procedure or to an emergency regulation adopted pursuant to subdivision (b) of this section.

"(b) If in any particular case the state agency makes a finding, including a statement of facts constituting the emergency in writing that the adoption of a regulation or order of repeal is necessary for the immediate preservation of the public peace, health and safety or general welfare, the regulation or order of repeal may be adopted as an emergency regulation or order of repeal."

Defendants mainly base their argument on a 1953 amendment of section 11440 of the Government Code as proof of the legislative intent that the "facts" given by the agency in a declaration of emergency must be accepted as true. Previously a regulation could be invalidated on the grounds that the "findings and statement do not constitute an emergency."[20] After 1953 this language was changed to: "the facts recited in the statement do not constitute an emergency . . . ." This is a rather tortured construction of the statute. Defendants then try to support their assertion by citing out of context the committee report by the Senate Interim Committee on Administrative Regulations that led to the amended language in Government Code section 11440. A closer look at the Second Preliminary and Partial Report by the Senate Interim Committee on Administrative Regulations in 1953 makes it clear that the wording of Government Code section 11440 was changed for the specific purpose of trying to eliminate abuses by administrative agencies of the power to make emergency regulations by expanding the scope of the judicial inquiry. The wording was changed to "the facts recited in the statement" from "findings and statement" because the Legislature intended the courts to have the power to judge the facts claimed by the agency as well as the statement of emergency.

The construction urged by defendants as to *emergency* regulations would be untenable. Such construction would allow any administrator with a closed-end budget, at any time during the fiscal year, to project a deficit and proceed to institute massive cutbacks free from any inquiry by the courts. In our view, such was not the intent of the legislation (see *Morris* v. *Williams, supra,* 67 Cal.2d at p. 737; cf. *Schenley Affiliated Brands Corp.* v. *Kirby* (1971) 21 Cal.App.3d 177, 192-194 [98 Cal.Rptr. 609]) and would, in effect, nullify section 11440 of the Government Code.[21] We conclude that the facts stated in the declaration of an emergency are not conclusive on the courts and thus the court below did not err in receiving evidence tending to impeach the facts recited in the declaration. (Cf. *In re Newell* (1922) 188 Cal. 762, 763 [207 P. 371].)

---

[20]Section 11440 presently reads: "Any interested person may obtain a judicial declaration as to the validity of any regulation by bringing an action for declaratory relief in the superior court in accordance with the provisions of the Code of Civil Procedure and in addition to any other ground which may exist, such regulation may be declared to be invalid for a substantial failure to comply with the provisions of this chapter or, in the case of an emergency regulation or order of repeal, upon the ground that the facts recited in the statement do not constitute an emergency within the provisions of Section 11421(b)."

[21]Defendants' reliance upon *Stockburger* v. *Jordan* (1938) 10 Cal.2d 636 [76 P.2d 671], and *Davis* v. *County of Los Angeles* (1938) 12 Cal.2d 412 [84 P.2d 1034], is misplaced since both cases involved emergency measures enacted by the state Legislature.

Assuming the court correctly admitted evidence, defendants next contend the court committed error in holding that the "facts asserted in the Findings as the basis for the Declaration of Emergency are not established by the evidence" and that "a potential fiscal insufficiency is not in itself an emergency."[22]

In effect, the defendants are rearguing the facts and setting them forth in the light most favorable to their position. Under the state of the record before us, we cannot say the trial court erred. (See *Foreman & Clark Corp.* v. *Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362].)

### 4. *Findings.*

■ Defendants contend the trial court erred in finding the regulations to be substantively invalid.[23] Before beginning our discussion of these arguments, we first note the court's language in *Bohn* v. *Watson* (1954) 130 Cal. App.2d 24, 41-42 [278 P.2d 454]: "It is elementary law that if a judgment is amply supported by findings which are sustained by sufficient evidence, questions relative to other findings become immaterial upon appeal and may be disregarded. [Citations.] Similarly, no merit attaches to Bohn's complaint regarding the court's conclusion of law that by the prior judgments she was collaterally estopped from denying that she acted fraudulently and dishonestly in the transactions therein referred to. The questioned conclusion was one of thirteen conclusions of law drawn by the trial court, which, unfortunately, did not winnow the findings and conclusions prepared by counsel with that nice discrimination that would have eliminated all surplusage from the case. However, it has been consistently held that a judgment will not be reversed because a conclusion is not legally sound, if the judgment is in fact a proper one. [Citations.] As stated in *Spencer* v. *Duncan, supra* [107 Cal. 423 (40 P. 549)], in quoting from two decisions of the Supreme Court (pp. 426-427): ' "But we do not reverse for what we regard as *bad logic,* but for what we consider *bad law* . . . . Where some of the conclusions of law in a decision are not properly drawn from the facts found this is no ground for reversing the judgment, if the ultimate conclusion upon which the judgment rests is not erroneous in view of the facts found." ' (Italics added.) This states the law here applicable."

The regulations were held by the trial court to be violative, in whole or in part, of the following provisions of the Welfare and Institutions Code:[24]

---

[22] Two statements were filed by Brian with the Secretary of State attempting to justify the emergency.

[23] They attack conclusions of law Nos. 14 through 21.

[24] These sections are set forth as they read at the time of the events in question. Italics have been supplied throughout.

14000. "The purpose of this chapter is to afford health care and related remedial or preventive services to recipients of public assistance and to medically indigent aged and other persons, including related social services which are necessary for those receiving health care under this chapter.

"The intent of the Legislature is to provide, to the extent practicable, through the provisions of this chapter, for health care for those aged and other persons, including family persons who lack sufficient annual income to meet the costs of health care, and whose other assets are so limited that their application toward the costs of such care would jeopardize the person or family's future minimum self-maintenance and security. It is intended that whenever possible and feasible:

"    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"(b) *The means employed shall be such as to allow eligible persons to secure health care in the same manner employed by the public generally, and without discrimination or segregation based purely on their economic disability.*"

14000.1. "It is the intent of the Legislature that the scope and duration of health services under this chapter shall be at least equivalent to the level provided in 1964-65 under public assistance programs."[25]

14103.4. "The director, with the advice of the Health Review and Program Council, shall determine which of the health care and related remedial or preventive services are elective. *The director and the Health Review and Program Council shall consult with representatives of providers of such services before making a determination.*"

14103.6. "At any time the director determines that it is necessary to postpone elective services pursuant to Section 14120, he shall require prior authorization for those services determined to be generally elective under the provisions of Section 14103.4, *except a service which costs less than one hundred dollars ($100) or a lower amount determined by the director. Such lower amount may be applied generally or for specific services.* The director may terminate the requirement for prior authorization when he determines that it is no longer necessary to postpone elective services."

14053.6. "Prior to including or excluding any drug from the program, the director *shall give adequate notice* to those California associations of health professionals and those recognized national associations of pharmaceutical manufacturers that are affected by such action *and shall seek and consider the advice of those associations.*"

---

[25]This section is periodically amended to update the "level provided" provision.

14054.5. " 'Elective services' means any treatment service which generally can be postponed *without seriously affecting the health of the person requiring the service."*

14120. "(c) At any time during the fiscal year, if the director has reason to believe that the total cost of the program will exceed available funds, he may, first modify the method or amount of payment for services, provided that no amount shall be reduced more than 10 percent and no modification will conflict with federal law. If such modification is not sufficient to bring the program within available funds, the director may postpone elective services. Such postponement of elective services shall be accomplished by changing the standards for approval of requests for prior authorizations. *Such changes shall be designed to insure that those recipients most in need of elective services receive them first within the funds available, but that no particular service is completely eliminated.*

"
.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"(f) *Before any of the above actions are taken by the director, he shall consult with representatives of concerned provider groups."*

In general, defendants contend that none of the regulations formulated by Brian conflicted with any of the above cited sections of the Medi-Cal Act. Although admitting that the guidelines were not issued in compliance with the act, they also contend that they were not so issued because they are *not* regulations within the meaning of the act.

As to the latter point, we think a close reading of the guidelines shows that they are regulations within the meaning of the act, and since the DHCS did not comply with the procedural demands of the Administrative Procedure Act, such guidelines are invalid. (Cf. *California Assn. of Nursing Homes, etc., Inc.* v. *Williams* (1970) 4 Cal.App.3d 800, 807-808, 816 [84 Cal.Rptr. 590, 85 Cal.Rptr. 735].)

As to the former point, we think the evidence adduced at trial, for the most part, supports the findings and conclusions of the trial court.[26]

---

[26]For example, Brian subjected large categories of services and drugs to prior authorization yet made no express determination, with a few exceptions, if the $100 limit was to be lowered. (See Welf. & Inst. Code, § 14103.6.) Brian took no steps to seek the advice of recognized pharmaceutical manufacturers prior to excluding drugs from the program. (See Welf. & Inst. Code, § 14053.6.) According to the evidence, prior authorization imposed on prescription drugs could result in their total denial even in emergency circumstances, despite the provisions of section 14103.6 of the Welfare and Institutions Code. There was no meaningful consultation with representative providers or the Health Review and Program Council with regard to the medical services and drug regulation. (See Welf. & Inst. Code, § 14103.4.) Also, the regulations did not take into account that those recipients most in need of elective services receive theirs first. (Welf. & Inst. Code, § 14120, subd. (c).)

### 5. *Administrative Remedies.*

Before a litigant may attack a Medi-Cal quasi-legislative regulation in court, he must apply for relief to the DHCS pursuant to section 11426 of the Government Code. (*Id.* at p. 809.) Concededly, CMA did file an administrative petition raising its objection which petition was denied by Brian on December 31, 1970. Defendants therefore admit that CMA has standing to maintain this action.

However, they maintain that O'Reilly and CDA[27] did not file administrative petitions for relief and are therefore barred by their failure to exhaust their available administrative remedies. (*United States* v. *Superior Court* (1941) 19 Cal.2d 189, 194 [120 P.2d 26].)

Suffice it to say, both O'Reilly and the CDA did not file complaints in intervention until after Brian had denied CMA's petition. It would have been an idle act on their part to go through the administrative motion. An exception to the general rule of exhaustion of administrative remedies is inadequacy of administrative relief. (*Greenblatt* v. *Munro* (1958) 161 Cal. App.2d 596, 605-606 [326 P.2d 929].) We find no error in the granting of judgment in favor of O'Reilly and CDA.

### 6. *Injunctive Order.*

Brian, during the period December 1970 through June 1972, was DHCS. In such capacity he was charged with the administration of the Medi-Cal Act. His actions in administering the act are limited by the annual appropriations to the Medi-Cal program. (*Morris* v. *Williams, supra,* 67 Cal.2d at pp. 749-750; *California Assn. of Nursing Homes etc., Inc.* v. *Williams, supra,* 4 Cal.App.3d at pp. 818-819.)

The judgment herein enjoined defendants from implementing: "any reenactment, adoption, or revision of said [December 1970 or February 1971 Medi-Cal] Regulations or [January 1971 Consultant] Guidelines or any part or portion thereof, substantially like the Regulations or Guidelines herein cited, or any part of them, which adoption, reenactment, or revision is violative of the conclusions filed herein."

Defendants contend: "This injunction places Brian in the impossible position of having to suffer possible contempt if respondents happen to disagree with his efforts to comply with legislative mandate." CMA admits that defendants could be cited for contempt if the injunction were held to have been violated, but claim that this cannot serve as a basis to invalidate the injunction. We disagree.

---

[27]O'Reilly has filed a brief on appeal. CDA has not.

As noted before, the DHCS operates under a closed-end budget. Under the fiscal realities of the day, the Legislature has wisely provided him with adequate tools to protect the public fisc and at the same time to carry out the purposes and intent of the act to the greatest feasible extent. We see no reason to place the DHCS in a straightjacket as to any future hypothetical administrative action because we hold that the regulations and guidelines here before us are invalid. We therefore conclude the injunctive decree is overly broad, uncertain and vague and is therefore invalid.

That portion of the judgment relating to an injunction is stricken. The remainder of the judgment is affirmed in its entirety. Respondents are to recover their costs on appeal.

Richardson, P. J., and Pierce, J.,* concurred.

Appellants' petition for a hearing by the Supreme Court was denied April 25, 1973.

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.