# IN THE SUPREME COURT OF CALIFORNIA

In re CHRISTOPHER LEE WHITE

on Habeas Corpus.

S248125

Fourth Appellate District, Division One
D073054

San Diego County Superior Court
SCN376029

May 21, 2020

Justice Cuéllar authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Chin, Corrigan, and Groban concurred.

Justice Kruger filed a concurring opinion, in which Justice Liu concurred.

# In re WHITE

## S248125

### Opinion of the Court by Cuéllar, J.

Under California's current system of pretrial detention, a felony arrestee's release pending trial is often conditioned on whether the arrestee posts money bail. To do so, an arrestee pays or secures a bond for a certain amount of money, as determined by the court, which may be forfeited if the arrestee later fails to appear. But an arrestee's "absolute right to bail" guaranteed by article I, section 12 of the California Constitution (*In re Law* (1973) 10 Cal.3d 21, 25) can be overcome by two exceptions the voters approved in the early 1980s and 1990s. Decades later and well into a new century, we review for the first time a trial court's denial of bail under one of these exceptions.

Petitioner Christopher Lee White was arrested on suspicion that he was involved in the attempted kidnapping and assault with intent to commit rape of a 15-year-old girl. The trial court denied bail after making two findings: (1) there was substantial evidence that White aided and abetted his friend, Jeremiah Owens, in the charged crimes; and (2) a "substantial likelihood" existed, supported by clear and convincing evidence, that White's release would result in great bodily harm to others. (Cal. Const., art. I, § 12, subd. (b) ["A person shall be released on bail by sufficient sureties, except for: [¶] . . . [¶] (b) Felony offenses involving acts of violence on another person, or felony sexual assault offenses on another person, when the facts are evident or the presumption great and the court finds based upon

1

clear and convincing evidence that there is a substantial likelihood the person's release would result in great bodily harm to others"].) When White challenged the no-bail order by filing a petition for writ of habeas corpus, the Court of Appeal upheld the trial court's findings and denied relief.

The Court of Appeal applied a deferential standard of review to the trial court's factual findings. Applying that standard, the appellate court found that the trial court acted within its discretion when it denied bail. We affirm.[1]

## I.

White and his codefendant Owens were arrested and charged with attempted kidnapping with intent to commit rape

---

[1] Shortly after this court granted review to decide whether the Court of Appeal erred in affirming the trial court's denial of bail, defense counsel informed us that White had pleaded guilty to being an accessory to a felony in violation of Penal Code section 32. Whether pretrial bail should have been granted is now a moot question as to White, but we have exercised our discretion to retain the matter for decision not only because it presents important issues that are capable of repetition yet may evade review (see *In re Webb* (2019) 7 Cal.5th 270, 273-274; accord, *Gerstein v. Pugh* (1975) 420 U.S. 103, 110, fn. 11 ["Pretrial detention is by nature temporary, and it is most unlikely that any given individual could have his constitutional claim decided on appeal before he is either released or convicted"]), but also "to provide guidance for future cases" by reviewing application of the substantive legal standard to a specific set of facts for the first time. (*Costa v. Superior Court* (2006) 37 Cal.4th 986, 994; see *id*. at pp. 1013-1029; cf. *Webb*, at p. 274 [declining to decide whether the record supported the bail condition because "[t]he district attorney expressly did not seek review of the specific question"].) Decisions concerning pretrial detention arise every day in our courts, so we "embrace the opportunity," as the Attorney General requested at oral argument, to "provide instruction to the trial courts."

(Pen. Code, § 209, subd. (b)), assault with intent to commit rape (*id.*, § 220, subd. (a)(1)), contact with a minor with intent to commit a sexual offense (*id.*, § 288.3, subd. (a)), and false imprisonment (*id.*, §§ 236, 237, subd. (a)). All of the crimes involved the same victim: 15-year-old J.D. (*In re White* (2018) 21 Cal.App.5th 18, 21 (*White*).) White was arraigned, pleaded not guilty, and was held without bail.

The facts underlying the charges, as well as the trial court's decision to deny bail, come from the preliminary hearing. That evidence consisted primarily of J.D.'s testimony, White's recorded interviews with law enforcement, and testimony from members of the San Diego County Sheriff's Department.

White, 27, and his friend and roommate Owens went to the beach in Encinitas one day in July 2017. Owens spent much of the day pointing out girls and talking about "grabbing" them. According to White, Owens "was like you know maybe I grab her . . . caveman style." Owens at one point wanted to leave the beach to follow a girl who had been sitting near them. When White complained that Owens had already had "plenty of chance" to chat with her "while we were here" at the beach, Owens responded, according to White, by saying "something about what about the screams?" At some point that day, while the two were talking about girls, Owens also asked White, "if I was gonna do something would you stop me? . . . He made like if he's like, if I get out of hand . . . . [I]f I was taking things too far would you stop me?" White claimed to have been "confused" by his friend's statements and believed he was "joking." He also claimed he replied to this question by saying "yeah I'd stop you."

Later in the afternoon, the two men left the beach but remained on and around White's truck, which was parked on an

access route to the beach. That's when 15-year-old J.D. showed up on her bike to go surfing. J.D., who lived in Encinitas, was on that day staying with close family friends in Carlsbad while the rest of her family was out of town. As she rode down the hill to her home, she noticed White's truck and the two men across the street from her neighbor's house. The two men, whom she later identified as Owens and White, "[l]ooked a little bit out of place" and gave her a "weird feeling." "[C]reepy" was the word used by a woman nearby who'd been loading her car. The woman's son felt the same way. He worried, in particular, that these men wanted to kidnap his younger brothers, which prompted him to take a short video of Owens and White with his cell phone. As J.D. retrieved her surfboard from the family house and came back outside, she felt the two men were staring at her and watching her every movement.

In fact, J.D. became so uncomfortable that she left the board in the driveway and went back inside the gate. At that point, she "didn't really know what to do." But she was also worried the men might take her board, so she grabbed her wax and went back outside. "I started waxing just to let them know that I am there." When a woman walked by with her kids, and a fellow surfer stopped to borrow some wax, J.D. relaxed and started to feel safe. Getting ready to wax the nose of her board, she even turned her back on the men across the street.

But White and Owens remained interested in J.D. In a taped interview, White admitted he may have remarked that J.D. was "pretty cute" and "[s]eems cool," and Owens may have said, "surfer chick; I think that's hot." White recalled that Owens may have added, "I think I'm going to go up and get that girl," at which point White encouraged him to "go and get her." White claimed in the interview that he thought Owens was just

4

going to talk to her. But he also admitted that Owens had asked White to "look out for me, or whatever, keep an eye or something like that." J.D. confirmed that White seemed "kind of like the lookout guy, I guess you could explain it. He was kind of keeping his eye up and down the street."

What Owens did next is not in dispute. He crossed the street and grabbed J.D. by the neck "like in a pressure lock," and sought to push her face into the pavement. J.D. testified that he would have succeeded if she had not put both hands on the concrete to brace herself. Owens then said, "All right. Let's do this" and tried to pull her back up and towards the truck. That's when J.D. "kind of figured it out" and managed to pull away. The whole time, she had been saying "No. No. Stop. Stop." When she fought him off and managed to get away, Owens and White seemed startled and confused — apparently surprised that she had escaped Owens's grip. She told them, "That's not cool. You can't do that."

As she sped to reenter her house, J.D. thought she heard White say "sorry." Yet White *also* told Owens to "[g]o in the house," as she was backing up through the gate. J.D. testified that White was looking at Owens as he directed Owens to follow her into the house, "[a]nd so I was just trying to lock the gate as fast as I could." The neighbor's dog remained at the gate, barking, which indicated to J.D. that Owens must have lingered on the other side for a time. She eventually saw Owens run across the street and into the passenger side of the truck, which then sped off up the hill. J.D. spent about 10 minutes in the house, crying and hyperventilating, and tried to contact her parents by phone. Eventually, at her father's direction, she called 911.

In the truck, White asked Owens "what was that about." According to White, Owens said, "I don't know, it was some primal instinct came over me. And it just happened." Owens also said that if White hadn't stopped him,[2] he "may have drug [*sic*] her through the gate." White suspected, in that event, Owens "probably would have tried taking advantage of her and raping her." White told the interviewing officers he was "not okay" with Owens's behavior — and assumed J.D. was going to call the police — but took no steps himself to contact law enforcement. He claimed he "probably" would have done so "if this situation got any worse."

The browser history on White's cell phone revealed an Internet search the day after the attack for "why would someone act on their primal instincts" and, on the following morning, for "How can you tell if someone you know is being brain washed [*sic*]" and "What to do if someone you know is being brainwashed." Owens's prior girlfriend and White each told law enforcement they believed Owens was being brainwashed by someone at work.

The court ordered both Owens and White bound over for trial on each of the charged offenses. It found probable cause to believe that Owens was the direct perpetrator and that White had aided and abetted him.

Following their arraignment, the court considered White's motion for reasonable bail. The motion noted that White was a high school graduate, was gainfully employed, and had no criminal record. It also summarized numerous letters from

---

[2] White claimed that as soon as he "realized what was happening, I'm like yo, stop." He denied telling Owens to "take her in the [house]."

family, friends, and members of the community attesting to his good character. The prosecutor argued that White "did, in fact, aid and abet, encouraged this very violent crime. And I believe that the Court is on sound legal ground to deny bail to him. I'll submit to the Court as to whether you would like to set bail, given the fact that he is not as culpable perhaps as Mr. Owens in being the direct perpetrator."

The trial court acknowledged that "the presumption" in a noncapital case is "that bail be set" and that "it would be an unusual case, in fact, it would be the quite rare case where someone was held on a non-capital offense without bail." But this case struck the court as sufficiently exceptional: "In looking at this case and the facts of this case, I do believe the facts are evident, the presumption is great. I do find by clear and convincing evidence that one defendant inflicted the acts of violence, the other person aided and abetted in that. The Court finds on the basis of the clear and convincing evidence that there is substantial likelihood that the release of either of these gentlemen would result in great bodily harm to others. I think the individuals at threat would be J.D. herself. I also think other children, who are the most vulnerable members of our society, would be at risk based on the conduct in this case and what's alleged to have occur[red] in this case. So it is extremely unusual, but I do find under these particular facts that the burden is met."

White sought a new bail hearing by filing a petition for writ of habeas corpus in the Court of Appeal. After issuing an order to show cause, the Court of Appeal denied relief in a published opinion. (*White*, *supra*, 21 Cal.App.5th 18.) The court found first that "the facts are evident [and] the presumption great" (Cal. Const., art. I, § 12, subd. (b) (hereafter article I,

section 12(b))) because there was substantial evidence that White had aided and abetted Owens's crimes against J.D. (*White*, at p. 26.) The court then upheld the trial court's finding of "a substantial likelihood the person's release would result in great bodily harm to others." (Art. I, § 12(b).) In making the latter determination, the court reasoned that the likelihood of bodily harm was a factual question, one subject to substantial evidence review. (*White*, at p. 29.) And because the exception in article I, section 12(b) requires "clear and convincing evidence" of great bodily harm, it declared that "[t]he ultimate question for a reviewing court is whether any reasonable trier of fact could have made the challenged finding by clear and convincing evidence." (*White*, at p. 30.)

The Court of Appeal deemed the question a close one in this case. What it ultimately concluded is that the trial court "could reasonably find that White and Owens deliberated over the attack over an extended period of time, that White agreed to act as a lookout during the attack, that White encouraged Owens to continue attacking J.D. by telling him to '[g]et in the house' even after she fought Owens off, and that White facilitated Owens's flight after the attack occurred." In addition to these facts, the appellate court emphasized that the trial court "could reasonably view the circumstances of the attack as highly unusual." Owens and White, after all, "loitered on a well-trafficked street near the beach while watching J.D. It was daytime. People passed by, including one surfer who talked with J.D. Unrelated witnesses saw Owens and White, described them as 'creepy,' and worried that they would kidnap children. Despite the likelihood that someone would see them, they perpetrated a brazen attack on J.D. — and White specifically wanted the attack to continue. The trial court could reasonably

find that the criminal impulse shared by Owens and White was so strong that White, either alone or in concert with another, would attack again if he were released." (*White, supra,* 21 Cal.App.5th at p. 31.)

We granted review to decide what standard of review applies to a trial court's denial of bail under article I, section 12(b), and whether the Court of Appeal erred in affirming the trial court's denial of bail in this case.

## II.

Our cases have recognized that defendants charged with noncapital offenses are generally entitled to bail. (*In re Law, supra,* 10 Cal.3d at p. 25; see Cal. Const., art. I, § 12.) But article I, section 12 provides for exceptions in particular circumstances when a defendant is charged with at least one felony offense. (Cal. Const., art. I, § 12, subds. (b), (c).) When the trial court denied bail here, it relied on the exception set forth in section 12(b): "Felony offenses involving acts of violence on another person, or felony sexual assault offenses on another person, when the facts are evident or the presumption great and the court finds based upon clear and convincing evidence that there is a substantial likelihood the person's release would result in great bodily harm to others."

White does not dispute that he was charged with one or more qualifying felonies involving acts of violence or sexual assault. What he challenges instead is the trial court's findings under article I, section 12(b) that "the facts are evident [and] the presumption great" with respect to any qualifying charged offense and that "there is a substantial likelihood the person's release would result in great bodily harm to others." The Court of Appeal was unpersuaded. We find no error.

## A.

Like most states, California allows courts to deny bail when the facts underlying the qualifying charge are "evident" or the "presumption great." (Art. I, § 12(b); see Hegreness, *America's Fundamental and Vanishing Right to Bail* (2013) 55 Ariz. L.Rev. 909, 922-923.) This peculiar phrasing predates the Union, originating in the Pennsylvania Frame of Government of 1682: " 'That all prisoners shall be bailable by sufficient sureties, unless for capital offenses, where the proof is evident, or the presumption [of guilt] great.' " (Hegreness, *supra*, 55 Ariz. L.Rev. at p. 920; see *id.* at p. 923, fn. 36.) Our court, in step with the broad consensus that has since emerged in other states, has interpreted this odd terminology to require evidence that would be sufficient to sustain a hypothetical verdict of guilt on appeal. (See *In re Weinberg* (1917) 177 Cal. 781, 782; *In re Troia* (1883) 64 Cal. 152, 153; *In re Nordin* (1983) 143 Cal.App.3d 538, 543 (*Nordin*); see generally 8A Am.Jur.2d (2019) Bail and Recognizance, § 62, pp. 398-399.)[3]

Whether that evidentiary threshold has been met is a question a reviewing court considers in the same manner the trial court does: by assessing whether the record, viewed in the light most favorable to the prosecution, contains enough

---

[3] This standard is more stringent than mere "sufficient cause," which is the showing required to hold a defendant to answer for an offense. (Pen. Code, § 872, subd. (a); see *People v. Slaughter* (1984) 35 Cal.3d 629, 637 ["the burden on the prosecution before the magistrate is quite distinct from that necessary to obtain a conviction before a judge or jury"].) The term "sufficient cause" means " 'such a state of facts as would lead a man of ordinary caution or prudence to believe, and conscientiously entertain a strong suspicion of the guilt of the accused.' " (*Slaughter*, at p. 636.)

evidence of reasonable, credible, and solid value to sustain a guilty verdict on one or more of the qualifying crimes. (See *People v. Zaragoza* (2016) 1 Cal.5th 21, 44 (*Zaragoza*).) The record in this case includes the testimony elicited at the preliminary hearing — including the sworn testimony of the victim herself — as well as White's recorded interviews with law enforcement. Even if a hypothetical fact finder might find the evidence susceptible to two interpretations, one of which suggests guilt and the other innocence, the relevant inquiry here is whether, in light of all the evidence, *any* reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*Zaragoza*, at p. 44.) That the circumstances might also reasonably be reconciled with the defendant's innocence does not render inadequate the evidence pointing towards guilt. (See *People v. Proctor* (1992) 4 Cal.4th 499, 529.)

White contends that while there was "no doubt" Owens attacked J.D., "there was not substantial evidence [he] aided and abetted Owens." To be guilty as an aider and abettor, a person must have knowledge of the direct perpetrator's unlawful purpose; have the intent or purpose of committing, encouraging, or facilitating the commission of the direct perpetrator's offense; and by act or advice aid, promote, encourage, or instigate the commission of that offense. (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054.) In our view, the record contains substantial evidence to support a finding that White aided and abetted Owens's assault with intent to rape.

What a reasonable fact finder could conclude is that White not only was aware of Owens's intent to rape, but acted to further it. As their day together progressed, Owens repeatedly spoke to White about "grabbing" girls "caveman style" and sent out feelers to gauge whether White would intervene if Owens

"was taking things too far." Although White claimed to have told his friend "yeah I'd stop you," a reasonable trier of fact could easily conclude that his actual conduct belied that claim. When Owens announced, "I think I'm going to go up and get that girl" — and asked White to "keep an eye" out — White did not stop his friend. A reasonable fact finder could conclude he did the opposite: he encouraged Owens to "go and get her" and, according to J.D., was "keeping his eye up and down the street" and acting as the "lookout guy." When Owens grabbed J.D. by the neck, at no time did White endeavor to pull his friend away or otherwise physically intervene to stop the attack. To the contrary: even after J.D. had broken free of the initial assault, White reportedly instructed Owens to "[g]o in the house" as J.D. was moving towards the gate. After J.D. got through the gate, White helped Owens flee by driving him away from the scene. Had Owens been able to follow J.D. through the gate, White admitted that his friend "probably would have tried taking advantage of her and raping her." To insist, as White does, that "[t]here is no evidence White knew Owens planned to attack J.D. or agreed to assist Owens in the attack" is not an accurate reading of the record.

True: the record also includes certain evidence tending to exculpate White. But that consisted mainly of White's own statements, and a fact finder would not be obliged to credit his assertion that he meant for Owens merely to " 'get her' like 'talk to her' " — which is hardly the kind of encounter for which Owens would have needed White to "keep an eye" out. Nor would a jury be compelled to believe White's uncorroborated statement that he told Owens "like yo, stop" or to infer that White instructed *J.D.* to "[g]o in the house." According to J.D., White was looking directly at Owens when he gave the

instruction to "[g]o in the house," and she herself was already "at the gate, getting in the gate" and needed no outside encouragement. Moreover, Owens seems to have understood that White was talking to *him*, since he remained at the gate for some time after J.D. escaped into the house. During that time, J.D. was "really worried" Owens was "going to either hop the fence . . . or somehow open the gate because it's an older gate. I didn't know if the lock really worked or not."

In any event, what counts under the standard for upholding the trial court's decision here is not whether there's any evidence at all supporting the defendant's contention. It's whether a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. Viewing the whole record — as we must (see *People v. Cuevas* (1995) 12 Cal.4th 252, 260-261) — we agree with the trial court that this element of article I, section 12(b) was satisfied.

## B.

To deny bail under article I, section 12(b), a trial court must also find, by clear and convincing evidence, "a substantial likelihood the person's release would result in great bodily harm to others." (Art. I, § 12(b).) This is a fact issue, as detailed below. On review, we consider whether any reasonable trier of fact could find, by clear and convincing evidence, a substantial likelihood that the person's release would lead to great bodily harm to others.

White points out, correctly, that this court has never articulated the standard by which we review a trial court's finding that an arrestee's release would likely result in great bodily harm to others. In materially similar inquiries, however, California courts have time and again invoked the substantial

evidence standard.  Consider, for instance, the Sexually Violent Predator Act (SVPA; Welf. & Inst. Code, § 6600 et seq.):  it authorizes civil commitment for sexually violent predators who have completed their prison sentences.  In that context, we apply substantial evidence review to the factual finding that these individuals are "a danger to the health and safety of others" in that they are "likely" to reoffend.  (Welf. & Inst. Code, § 6600, subd. (a)(1); see *Cooley v. Superior Court* (2002) 29 Cal.4th 228, 257-260; *People v. McCloud* (2013) 213 Cal.App.4th 1076, 1088-1090.)  Similarly, other courts have reviewed for substantial evidence the factual finding that "not guilty by reason of insanity" (NGI) acquittees who have completed their maximum term of commitment continue to represent a substantial danger of physical harm to others.  (*People v. Kendrid* (2012) 205 Cal.App.4th 1360, 1362-1363, 1370; *People v. Bowers* (2006) 145 Cal.App.4th 870, 878.)  Whether an arrestee poses a substantial likelihood of great bodily harm to others is a determination similar to what must be found under these statutory schemes — and each of these schemes involves the decision whether to restrict a person's liberty.  What we conclude is that the danger posed by an arrestee if released on bail is likewise a question of fact we review for substantial evidence.

White, along with his amici curiae, presses us to embrace a standard of independent, de novo review.  What they misapprehend, though, is the nature of the inquiry under article I, section 12(b).  White simply *assumes* that the likelihood of future harm amounts to a mixed question of law and fact, but offers no reason why.  And he fails to grapple with how California courts review similar future-harm determinations under various civil commitment schemes.  So his reliance on

*People v. Cromer* (2001) 24 Cal.4th 889 is unpersuasive. In that case, we held that whether a prosecutor exercised due diligence in attempting to secure the attendance of an absent witness in criminal proceedings was subject to independent review because it was a mixed question of law and fact. (See *id.* at p. 901.) But *Cromer* offers a poor analogy. Pretrial detention determinations are more similar to detention determinations under the SVPA and NGI commitment schemes than to determinations concerning the diligence of prosecutorial efforts to secure attendance of an absent witness in a criminal case. Our courts have consistently treated the likelihood of future harm as a question of fact in SVP and NGI proceedings, and the resulting systems for making those determinations have proved workable. Pretrial detention decisions that pivot on an arrestee's likelihood of future harm call on trial courts to play a similar role; such determinations are likewise best characterized as questions of fact, subject to deferential review.[4]

We find further support for our conclusion in closely analogous decisions of our sister states and the federal courts. These courts, too, characterize the danger an arrestee's release may pose to the community as a factual question to be reviewed deferentially. (See *U.S. v. Hir* (9th Cir. 2008) 517 F.3d 1081, 1086 ["The district court's factual findings concerning the

---

[4]     White also contends that an arrestee's presumption of innocence mandates an independent standard of review. While we agree that release on bail generally safeguards the presumption of innocence principle (see *Stack v. Boyle* (1951) 342 U.S. 1, 4), the presumption does not *itself* restrict a court's authority to order pretrial detention in appropriate cases. (See *Bell v. Wolfish* (1979) 441 U.S. 520, 533; accord, *In re York* (1995) 9 Cal.4th 1133, 1148.)

danger that [the defendant] poses to the community are reviewed under a 'deferential, clearly erroneous standard' "]; *U.S. v. Smith* (D.C. Cir. 1996) 79 F.3d 1208, 1209 ["We review the district court's finding of fact regarding the safety of the community for clear error"]; *U.S. v. Maull* (8th Cir. 1985) 773 F.2d 1479, 1488 ["the individual characteristics of the defendant and the nature and seriousness of the danger to any person or the community that would be posed by the person's release involve primarily factual issues"]; *U.S. v. Hurtado* (11th Cir. 1985) 779 F.2d 1467, 1472 ["factual questions pertaining to individual characteristics of the defendant and the threat posed by his release . . . . are subject to the clearly erroneous standard of review"]; *U.S. v. Chimurenga* (2d Cir. 1985) 760 F.2d 400, 405; *Bradshaw v. United States* (D.C. 2012) 55 A.3d 394, 397 ["We defer to the trial court's factual findings, including 'dangerousness' "]; *Wheeler v. State* (Md.Ct.Spec.App. 2005) 864 A.2d 1058, 1065-1066 ["We shall therefore determine whether the circuit court was clearly erroneous in finding that appellant was too dangerous to be released pending trial"]; see generally *People v. Cromer*, *supra*, 24 Cal.4th at p. 894 ["an appellate court reviews findings of fact under a deferential standard (substantial evidence under California law, clearly erroneous under federal law)"].)

These authorities are fully consistent with our embrace of a substantial evidence standard for review of a trial court's finding that an arrestee's release would trigger the requisite likelihood of great bodily harm to others. (Art. I, § 12(b).) Our state Constitution nonetheless imposes an additional hurdle: that the likelihood of great bodily harm be established by "clear and convincing evidence." (*Ibid*.) Clear and convincing evidence requires a specific type of showing — one demonstrating a " 'high

probability' " that the fact or charge is true. (*Broadman v. Commission on Judicial Performance* (1998) 18 Cal.4th 1079, 1090; see *In re Angelia P.* (1981) 28 Cal.3d 908, 919; *Nordin, supra,* 143 Cal.App.3d at p. 543.) So, on review, we consider whether any court could have found clear and convincing evidence that the person's release on bail posed a substantial likelihood of great bodily harm to others. (See *Conservatorship of Wendland* (2001) 26 Cal.4th 519, 552; cf. *Zaragoza, supra,* 1 Cal.5th at p. 44 ["whether, in light of all the evidence, '*any* reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt' "].)

The crimes White stands accused of aiding and abetting were attempted kidnapping and assault with intent to commit rape on a minor. They bore what a reasonable observer would surely call a substantial likelihood of great bodily harm to J.D. Owens grabbed J.D. by the neck with a "super tight" grip and would have forced her face into the concrete had she not braced herself. And if J.D. had not successfully, and unexpectedly, fought off her attacker, White acknowledged that Owens "probably" would have forcibly raped her.

In White's view, the trial court had no basis to conclude that he poses any risk of harm to others because what his friend did was "sudden and unexpected." In light of the deferential standard of review, though, we are constrained to agree with the Court of Appeal: there was sufficient evidence to support the trial court's finding that White would cause great bodily harm to this victim or others, if released. An examination of the whole record reveals credible evidence that Owens deliberated about sexual assault of a random victim for a substantial period — and that White was well aware of this and aided him nonetheless.

White's taped statements supported a finding that Owens had been exploring his interest in abducting a girl *the entire day*. While they were at the beach, Owens asked White whether White would stop him if he were to "get out of hand" or "was taking things too far" with a girl. When asked at the beach why he wanted to approach a girl now that she was no longer sitting next to them, Owens replied, "what about the screams?" J.D. arrived after these exchanges and after the two men had finished their day at the beach. They gave her "a bad feeling." A nearby adult called the men "creepy."

It was in this context that White allegedly chose to ratchet things up. White was the first to spot J.D. and remarked to Owens that she was "pretty cute" and seemed "cool." After Owens "may have mentioned . . . something about her," White coaxed his friend to "go and get her." In his interview, White claimed he meant "[g]et her . . . like go get her, talk to her. Get her information." Yet the record tends to support a finding that harmless verbal flirting was not the type of encounter Owens had spent the day discussing with White. When Owens talked with White about women that day, he was imagining taking them "caveman style" and was contemplating how best to avoid drawing attention to "the screams" or having White "stop" him. Under the circumstances, the trial court could reasonably have concluded that Owens did as he was encouraged to do — he grabbed her, asserted control, and would have raped her, if she had not managed to escape — while White acted as a lookout and directed his friend to take J.D. in the house. The trial court was not compelled to find that White's behavior was a one-off, an unusual situation that was unlikely to recur. Indeed, White acted as the getaway driver, never contacted police about the attack on an unaccompanied girl barely half his age, and, even

when interviewed by law enforcement, allowed that he "probably" would have done so only "if this situation got any worse."

White emphasizes here the same point he pressed in the trial court and in the Court of Appeal: that he had no prior criminal record and had the support of his family and the community in Arizona, where he intended to reside. Those supporters described him as "non-violent, responsible, and respectful." White also contends that he was as surprised as anyone by Owens's behavior, as evidenced by his Internet searches in the days after the attack about "primal instincts" and "being brainwashed." Yet the trial court was not obligated to accept the most benign version of White's involvement.[5] Moreover, the opinions of White's friends and family offered only a piece of the puzzle. The trial court, after all, could not ignore the most recent evidence of White's behavior as it bore on his character and his likelihood of reoffending.

White makes much of the fact that J.D.'s injuries were "minor" and that the entire encounter was "brief." But the 15-year-old victim's injuries were minor only because the plan White allegedly assisted was thwarted early. Had the incident unfolded as Owens had intended, the injuries would have been anything but minor. J.D. testified that Owens would have smashed her face into the concrete if she "didn't catch" herself, and White acknowledged that Owens would have raped her if she hadn't escaped.

---

[5]     Indeed, the detective who participated in White's second interview believed "there was plenty of evasion" in White's account of the events.

So the trial court's finding of future danger, while presenting a close question on this record, did not rest "merely on the fact of arrest for a particular crime," but on an "individualized determination" that White's release threatened others with a substantial likelihood of great bodily harm. (*U.S. v. Scott* (9th Cir. 2006) 450 F.3d 863, 874.) Given the deferential standard of review, we conclude that the trial court's determination finds sufficient support in the record. (See *Nordin*, *supra*, 143 Cal.App.3d at p. 543 ["the superior court had before it an ample record to support the denial of bail"].)

## C.

That the trial court found as it did, of course, does not mean it was *required* to deny bail. A person who falls within the article I, section 12(b) exception does not have a right to bail, yet may nonetheless be granted bail — or release on the person's own recognizance — in the trial court's discretion. (See Ballot Pamp., Primary Elec. (June 8, 1982) analysis of Prop. 4 by Legis. Analyst, p. 16 ["The proposal . . . would broaden the circumstances under which the courts *may* deny bail" (italics added)]; cf. *People v. Tinder* (1862) 19 Cal. 539, 542.) Because this determination calls for an exercise of judgment based on the record before the court, we review a trial court's ultimate decision to deny bail for abuse of discretion. (See *Richardson v. Superior Court* (2008) 43 Cal.4th 1040, 1047; *People v. Jordan* (1986) 42 Cal.3d 308, 316; accord, *Lathan v. State* (Ga.Ct.App. 1988) 373 S.E.2d 388, 389; *Fischer v. Ball* (Md. 1957) 129 A.2d 822, 827; *State v. S.N.* (N.J. 2018) 176 A.3d 813, 824; *People ex rel. Shapiro v. Keeper of City Prison* (N.Y. 1943) 49 N.E.2d 498, 501; *Com. v. Pal* (Pa.Super.Ct. 2013) 34 Pa.D. & C.5th 524, 539; *Ex parte Shires* (Tex.Ct.App. 2016) 508 S.W.3d 856, 860; *Fisher v. Commonwealth* (Va. 1988) 374 S.E.2d 46, 51; *State v. Pelletier*

(Vt. 2014) 108 A.3d 221, 223.) Under this standard, a trial court's factual findings are reviewed for substantial evidence, and its conclusions of law are reviewed de novo. (See *Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711-712.) An abuse of discretion occurs when the trial court, for example, is unaware of its discretion, fails to consider a relevant factor that deserves significant weight, gives significant weight to an irrelevant or impermissible factor, or makes a decision so arbitrary or irrational that no reasonable person could agree with it. (See *People v. Knoller* (2007) 41 Cal.4th 139, 156; *People v. Carmony* (2004) 33 Cal.4th 367, 377; accord, *State v. S.N.*, at p. 815.)

In exercising that discretion, a trial court must consider, at a minimum, "the protection of the public, the seriousness of the offense charged, the previous criminal record of the defendant, and the probability of his or her appearing at the trial or hearing of the case" — and among those factors, "public safety shall be the primary consideration." (Pen. Code, § 1275, subd. (a).) The trial court did so here, after hearing sworn testimony from the victim herself and an audio recording of White's interviews with the investigating detectives — and after White had the opportunity to cross-examine witnesses and offer evidence. In light of how the court chose to exercise its discretion, we cannot say its decision to detain White was so arbitrary or irrational that no reasonable person could agree with it. (See *People v. Carmony*, *supra*, 33 Cal.4th at p. 377.)

That said, there's quite a bit we're *not* deciding today. A different part of the California Constitution — subdivision (f)(3) of article I, section 28 — directs courts to take into account the "safety of the victim" when "setting, reducing, or denying bail" and to make it, along with public safety, "the primary considerations." Because concerns about victim safety would

only reinforce the trial court's decision to deny bail here, we need not decide what role, if any, this provision has in the decision to deny bail under article I, section 12(b). Nor do we decide how section 12(b) and section 28, subdivision (f)(3) interact more broadly. In addition, we did not grant review — and do not resolve here — whether, before denying bail, a court must first determine that no condition or conditions of release can adequately protect public or victim safety. Our opinion should not be read as reaching that question. Likewise, we do not resolve what constraints, if any, Penal Code section 1271[6] imposes on a trial court's authority to deny bail in noncapital cases. Neither party cited that provision.

Finally, we recognize that a defendant in custody naturally has a greater incentive to plead guilty than does a defendant on pretrial release, especially if the time to trial roughly matches the defendant's potential sentence exposure. (See Pretrial Detention Reform Workgroup, Pretrial Detention Reform: Recommendations to the Chief Justice (Oct. 2017) p. 14; Bibas, *Plea Bargaining Outside the Shadow of Trial* (2004) 117 Harv. L.Rev. 2463, 2492-2493.) In weighing whether a defendant should be detained, trial judges should be mindful that pretrial detention has a practical impact on even an innocent defendant's decision whether to negotiate a plea.

## III.

To deny bail under article I, section 12(b), a court must satisfy itself that the record contains not only evidence of a qualifying offense sufficient to sustain a hypothetical verdict of

---

[6] Penal Code section 1271 provides: "If the charge is for any other offense, he may be admitted to bail before conviction, as a matter of right."

guilt on appeal, but also clear and convincing evidence establishing a substantial likelihood that the defendant's release would result in great bodily harm to others. In reviewing a denial of bail, an appellate court must determine, too, whether the record contains substantial evidence of a qualifying offense — and, if so, whether any reasonable fact finder could have found, by clear and convincing evidence, a substantial likelihood that the defendant's release would result in great bodily harm to one or more members of the public. Where both elements are satisfied and a trial court has exercised its discretion to deny bail, the reviewing court then considers whether that denial was an abuse of discretion.

White was charged with felony offenses involving acts of violence and sexual assault. A reasonable fact finder could conclude, based on the evidence presented at the adversarial hearing, that White was guilty of at least one of these offenses beyond a reasonable doubt. A court could also conclude, by clear and convincing evidence, there was a substantial likelihood that White's release could result in great bodily harm to others. The trial court's decision to order White detained on this basis was no abuse of discretion. We therefore affirm the judgment of the Court of Appeal.

**CUÉLLAR, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**GROBAN, J.**

In re WHITE

S248125


Concurring Opinion by Justice Kruger


This case is moot. Christopher Lee White challenges his pretrial detention without bail, but he has already pleaded guilty to one of the crimes charged. His pretrial detention is now long over, and there is no longer any effective relief this court can provide. (See maj. opn., *ante*, at p. 2, fn. 1.)

That is not, of course, the end of the matter. While courts ordinarily avoid deciding moot cases (e.g., *Consol. etc. Corp. v. United A. etc. Workers* (1946) 27 Cal.2d 859, 863–865), we do have the power to do so—a power we generally exercise only to decide issues " 'of broad public interest' " that are " 'likely to recur' " (*Ballard v. Anderson* (1971) 4 Cal.3d 873, 876). This case presents such a question: What standard of review applies to a trial court's denial of bail under article I, section 12, subdivision (b) of the California Constitution? This is an issue that " 'is likely to recur, might otherwise evade appellate review, and is of continuing public interest.' " (*People v. DeLeon* (2017) 3 Cal.5th 640, 646.) I thus agree with the majority's decision to reach this question, as well as with the majority's decision affirming the standard of review articulated by the Court of Appeal in this case.

I would not, however, go on to decide whether the Court of Appeal correctly applied that standard to the facts here. The critical contested issue was whether the evidence supported the

trial court's finding that White posed a likelihood of causing great bodily harm if released on bail. (See Cal. Const., art. I, § 12, subd. (b).) As the Attorney General acknowledged at oral argument, the facts of this case are unusual. The issue posed is unlikely to recur with any frequency. Nor does addressing the issue provide particularly helpful guidance for how to apply the standard to more typical cases. This case, by the Court of Appeal's own reckoning, is a marginal one. As that court put it: "[E]ven given our deferential standard of review, this record tests the bounds of what would sustain an order remanding a defendant without bail under the California Constitution." (*In re White* (2018) 21 Cal.App.5th 18, 31.)

We are certainly under no obligation to reach the now-moot question whether the record was sufficient to support the trial court's no-bail order in this particular case. (See, e.g., *In re Webb* (2019) 7 Cal.5th 270, 278 [declining to decide moot question whether specific bail condition was valid].) And there are good reasons not to reach it. The answer to that fact-specific question is no longer of interest to the parties, nor will it provide much meaningful guidance to courts or the public. By unnecessarily delving into the facts of a marginal case, we run the risk of confusing the law more than we clarify it.

While I agree with the majority's answer to the standard of review question, I do not join in its application of that standard to these facts and concur in the judgment only.

**KRUGER, J.**

**I Concur:**

**LIU, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** In re White

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 21 Cal.App.5th 18
**Rehearing Granted**

_____

**Opinion No.** S248125
**Date Filed:** May 21, 2020

_____

**Court:** Superior
**County:** San Diego
**Judge:** Robert J. Kearney

_____

**Counsel:**

Boyce & Schaefer, Laura Schaefer, Robert E. Boyce and Benjamin Kington for Petitioner Christopher Lee White.

Rita Himes for Legal Services for Prisoners with Children as Amicus Curiae on behalf of Petitioner Christopher Lee White.

Sanger Swysen & Dunkle, Robert M. Sanger and Stephen K. Dunkle for California Attorneys for Criminal Justice as Amicus Curiae on behalf of Petitioner Christopher Lee White.

Kathleen Guneratne, Micaela Davis, Peter Eliasberg and David Loy for American Civil Liberties Union Foundation of Northern California, Inc., American Civil Liberties Union Foundation of Southern California, Inc., and American Civil Liberties Union Foundation of San Diego and Imperial Counties, Inc., as Amici Curiae on behalf of Petitioner Christopher Lee White.

Summer Stephan, District Attorney, Jesus Rodriguez, Assistant District Attorney, Peter Quon, Jr., Mark A. Amador, Linh Lam, Lilia E. Garcia and Daniel Owens, Deputy District Attorneys, for Respondent the People.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Laura Schaefer
Boyce & Schaefer
934 23rd Street
San Diego, CA 92102-1914
(619) 232-3320

Daniel Owens
Deputy District Attorney
330 W. Broadway, Suite 860
San Diego, CA 92101
(619) 685-6639